[No. A132892. First Dist., Div. One. Feb. 28, 2013.]

SOUTHERN CALIFORNIA CEMENT MASONS JOINT
APPRENTICESHIP COMMITTEE et al., Plaintiffs and Appellants, v.
CALIFORNIA APPRENTICESHIP COUNCIL, Defendant and Respondent;
SOUTHERN CALIFORNIA LABORERS CEMENT MASONS JOINT
APPRENTICESHIP COMMITTEE, Real Party in Interest and Respondent.

**1532**

1534

**COUNSEL**

Wohlner Kaplon Phillips Young & Cutler, Jeffrey L. Cutler and Elizabeth Rosenfeld for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Paul Gifford, Assistant Attorney General, Joyce E. Hee and Anne Michelle Burr, Deputy Attorneys General, for . Defendant and Respondent.

Reich, Adell & Cvitan, Alexander B. Cvitan, J. David Sackman and Angela Serranzana for Real Party in Interest.

**OPINION**

**MARGULIES, J.**—Appellants Southern California Cement Masons Joint Apprenticeship Committee and San Diego County Cement Masons Joint Apprenticeship Committee (hereafter the Existing Committees) operated the only state-approved apprenticeship training programs for cement masons in

Southern California. In December 2008, real party in interest Southern California Laborers Cement Masons Joint Apprenticeship Committee (hereafter Laborers Committee) applied for approval of its own cement mason apprenticeship program. Once an apprenticeship program has been approved for a particular trade in a particular area, however, respondent California Apprenticeship Council (Council) can approve a new program only if the existing approved program has been found deficient or lacks the capacity or has neglected or refused to dispatch sufficient apprentices to public works contractors in the area.

The sponsors of the proposed new program submitted evidence that (1) public works contractors in Southern California employed cement mason apprentices at a lesser rate than required by the prevailing wage law, with many employing no apprentices at all and (2) the existing approved programs were graduating journeypersons at a rate insufficient to meet the state's estimate of demand for new cement masons in the area. Although the operators of the existing approved programs demonstrated they dispatched apprentices to local contractors whenever requested, they had taken little or no action to address the underemployment of apprentices in their area. On this evidence, the Council granted the application for approval, finding the existing approved programs both lacked the capacity and neglected to dispatch sufficient apprentices to local public works contractors. The trial court denied a petition for writ of mandate filed by the operators of the existing approved programs challenging the Council's grant of the application for approval. We affirm.

## I. BACKGROUND

A. *Legal Background*

California regulates programs for the training of apprentices in the construction trades under the Shelley-Maloney Apprentice Labor Standards Act of 1939 (Act) (Lab. Code,[1] § 3070 et seq.; see *Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council* (1992) 4 Cal.4th 422, 428–429, 433 [14 Cal.Rptr.2d 491, 841 P.2d 1011] (*Southern Cal.*).) Oversight of apprenticeship programs is vested in the Division of Apprenticeship Standards (DAS), one of five divisions within the Department of Industrial Relations (Department). (*Southern Cal.*, at p. 433; §§ 56, 3070, 3073.) The Council is a public body consisting largely of DAS officials and industry and trade union representatives appointed by the Governor. The Council's purpose is to "aid[] the Director [of Industrial Relations] in formulating policies for the effective administration" of the laws governing apprenticeship, including

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

through the formulation of regulations establishing standards for apprentice working conditions and assuring equal opportunities in apprenticeship programs. (*Southern Cal.*, at p. 433; see §§ 3070, 3071.)

The Act encourages construction industry trade unions and employers to create programs to train and regulate the employment of apprentices.[2] (§§ 3075, subd. (a), 3076.) Such an apprenticeship program can apply for official approval by the DAS. (§ 3075, subd. (a).) Although DAS approval is not required for the operation of a program, "strong financial incentives" and other advantages are available to approved programs. (*Southern Cal., supra,* 4 Cal.4th at pp. 428–429.) Most importantly, only apprentices from approved programs are eligible to take advantage of the opportunities for employment provided by California's prevailing wage law. Section 1777.5, the prevailing wage law provision relating to apprentice employment, requires contractors on public works to employ apprentices at a fixed ratio to journeypersons. (*Id.,* subds. (g), (i).) Such apprentices must be paid a specially set prevailing wage applicable only to apprentices (*id.,* subd. (b)), and only apprentices from approved programs are eligible to receive this special wage (*id.,* subd. (c)). As a result, only apprentices from approved programs can satisfy a contractor's statutory duty to employ apprentices on public works. (See *Associated General Contractors of America v. San Diego Unified School Dist.* (2011) 195 Cal.App.4th 748, 761 [125 Cal.Rptr.3d 698].) In addition, financial subsidies for training are provided to approved programs, and an apprentice who completes an approved program obtains a certificate of completion naming him or her a skilled journeyperson in the chosen trade, increasing his or her marketability. (*Southern Cal., supra,* 4 Cal.4th at pp. 428–429; § 1777.5, subd. (m); Cal. Code Regs., tit. 8, § 224.)

Once an apprenticeship program has been approved for a particular trade in a particular area, section 3075 gives the approved program significant protection from competition by other apprenticeship programs. (See *Southern Cal., supra,* 4 Cal.4th at p. 452 ["the only apparent purpose of [a regulation implementing an earlier version of section 3075] is to restrict competition among apprenticeship programs . . . ."].) By statute, a new apprenticeship program can be granted approval only if "training needs justify the establishment" of the new program. (§ 3075, subd. (a).) In determining whether "training needs justify" the approval of an apprenticeship program, the DAS is guided by specific statutory criteria. (§ 3075, subd. (b)(1)–(3).) As would be expected, approval is justified if there is no approved program in the geographic area to serve the particular trade. (§ 3075, subd. (b)(1).) When an

---

[2] "Where a collective bargaining agreement exists," the program must be sponsored jointly by unions and employers, unless one of these parties waives its participation. Otherwise, a program can be administered unilaterally by a union, employer group, or an individual employer. (§ 3075, subd. (a).)

approved apprenticeship program already exists to serve the trade in the area, however, a new program can be approved only if the existing approved program has been identified as deficient by regulators or the existing program "do[es] not have the capacity, or neglect[s] or refuse[s], to dispatch sufficient apprentices to qualified employers at a public works site who are willing to abide by the applicable apprenticeship standards." (§ 3075, subd. (b)(2), (3).)

As noted above, the prevailing wage law promotes employment of apprentices by requiring contractors performing contracts awarded by public agencies to employ apprentices at a ratio of no less than one hour of apprentice work for every five hours worked by journeypersons. (§ 1777.5, subds. (d), (g); Cal. Code Regs., tit. 8, § 230.1, subd. (a).) Before beginning a public work, contractors are required to provide the local approved apprenticeship programs "an estimate of journeyman hours to be performed under the contract, the number of apprentices proposed to be employed, and the approximate dates the apprentices would be employed." (§ 1777.5, subd. (e).) If, after beginning work, a contractor is not employing sufficient apprentices to meet the required ratio, the contractor must request the dispatch of apprentices in writing from the local approved programs. (Cal. Code Regs., tit. 8, § 230.1, subd. (a).) Further, within 60 days after completing the work, "each contractor and subcontractor shall submit to the . . . apprenticeship program a verified statement of the journeyman and apprentice hours performed on the contract." (§ 1777.5, subd. (e).) "[A]ny person" may file a complaint of noncompliance with the provisions of section 1777.5 governing apprentice employment (Cal. Code Regs., tit. 8, § 231, subd. (a)), and employers found in knowing violation of section 1777.5 may be fined and temporarily barred from bidding on public works (§ 1777.7, subds. (a), (b)).

B. *The Administrative Proceedings*

In December 2008, the Laborers Committee, an organization sponsored by the Southern California District Council of Laborers and three construction industry employers, sought the approval of a new apprenticeship program in the cement mason trade for 12 Southern California counties, stretching from the Mexican border to Santa Barbara. As required by the Department's regulations, the Laborers Committee submitted its application for approval to the acting chief of DAS (Chief), including written program "standards," the guidelines under which the new program proposed to operate, and evidence of the committee's ability to operate the program successfully. (Cal. Code Regs., tit. 8, § 212.2, subd. (a).)

The Existing Committees, the operators of the two existing approved cement mason apprenticeship programs in the relevant geographic area (hereafter the approved programs), submitted comments in opposition to

approval of the new program. (Cal. Code Regs., tit. 8, § 212.2, subd. (g); see *Independent Roofing Contractors v. California Apprenticeship Council* (2003) 114 Cal.App.4th 1330, 1336–1337 [9 Cal.Rptr.3d 477].) The Existing Committees argued the Laborers Committee failed to demonstrate that "training needs" existed in the area to justify approval of a new program and lacked the experience and qualifications to operate an apprenticeship program in the cement mason trade.

The Laborers Committee submitted a written response to the comments, accompanied by documentary evidence. The response argued training needs justified the approval of a new program under section 3075, subdivision (b)(2) because the approved programs lacked the capacity to satisfy existing and future demand for cement masons. Based on data from the Employment Development Department (EDD), the Laborers Committee estimated there had been 142 and 188 cement mason openings on public works in Southern California in the years 2007 and 2008. In the respective years immediately prior, the approved programs had graduated 39 and 37 apprentices to fill these openings. The deficiency was even greater if private work openings were included.

The Chief approved the Laborers Committee's proposed program without any further formal action. In a decision dated September 29, 2009, the Chief found training needs existed because the approved programs lacked the capacity to supply the anticipated need for apprentices in the area over the next several years. In making this finding, the Chief rejected the Existing Committees' argument that "need" under section 3075, subdivision (b)(2) must be measured solely by capacity to supply apprentices for public projects and that the approved programs could expand to meet demand. The Chief concluded the approved programs' failure to graduate sufficient journeypersons to serve overall industry needs demonstrated they intended to serve only contractors that had signed the collective bargaining agreement of their sponsoring unions, a different group of employers than those the Laborers Committee intended to serve.[3]

The Existing Committees appealed the Chief's decision to the Council. (§ 3082.) As required by DAS regulations, the appeal was initially heard by a three-member panel designated by the Council chairperson. The panel elected to conduct an evidentiary hearing, although it was not required to do so. (Cal. Code Regs., tit. 8, § 212.2, subds. (k), (*l*).)

Before the Council, the Laborers Committee not only repeated its argument the approved programs lacked sufficient capacity, but it also argued the

---

[3] The Chief also found the qualifications and experience of the Laborers Committee sponsors to be adequate. That finding is not challenged in this appeal.

approved programs had "neglect[ed] or refus[ed]" to dispatch sufficient apprentices to public works sites. (§ 3075, subds. (b)(2).) In support of the latter argument, the Laborers Committee submitted a survey of records from 65 randomly selected Los Angeles Unified School District public works jobsites between 2008 and 2010. All were within the jurisdiction of the approved programs and subject to the prevailing wage law. The contractors at 55 of the 65 worksites, or 85 percent of the sites surveyed, employed cement mason apprentices at less than the statutorily required rate of one apprentice hour per five journeyperson hours. Twenty-six of the contractors, or 40 percent of the jobsites, used no cement mason apprentices at all, despite reporting work by journeyperson masons.

Addressing this argument, the Existing Committees submitted evidence demonstrating the approved programs invariably dispatched apprentices to both signatory and nonsignatory employers. An official of the approved programs testified that whenever an employer sent the programs a copy of "Form 140," the official DAS form an employer uses to notify an approved program of its labor needs in connection with an upcoming public work (§ 1777.5, subd. (e)), the programs sent the employer a written notice of its legal obligation to use apprentices on the job and an offer to supply the apprentices. The programs responded in the same manner to employers who were signatories of the sponsoring unions' collective bargaining agreement and to nonsignatory employers. In addition, the Existing Committees submitted a substantial number of copies of "Form 142," the DAS form employers are required to use when requesting the dispatch of apprentices from an approved program. (Cal. Code Regs., tit. 8, § 230.1.) The official testified the programs had never failed to dispatch apprentices in response to such a request when made with at least 48 hours' notice. Other than sending a letter upon receiving a Form 140, however, the approved programs did nothing to ensure contractors were employing the number of apprentices on their public works required by the prevailing wage law, leaving it to the local unions to contact the contractors and discuss the use of apprentices. An official of the approved programs acknowledged that some contractors that requested apprentices for public works jobsites transferred apprentices to private projects, leaving the contractor short of apprentices on its public works. As to these and other public works, the official conceded the approved programs tolerated insufficient use of apprentices.

To refute the lack of capacity argument, the Existing Committees demonstrated the approved programs had, in the past, trained as many as 728 apprentices in a single year. The program coordinator explained the apprenticeship program lasted four years. Trainees were required to attend 160 hours per year of class time. The approved programs operated six training centers in cities across Southern California. Between them, these training centers contained 14 classrooms, each holding 50 students, at which classes were held

each Saturday. At the time of the testimony, not all of the classrooms were in active use due to lack of demand for apprentices. The coordinator believed the size of the programs could be doubled or tripled by "rotat[ing] the classes" or bringing in additional modular classroom units.

The three-member panel issued a written decision recommending denial of the Existing Committees' appeal by the full Council, over the dissent of one panel member. The majority panel members found the approved programs "routinely dispatched apprentices to employers who requested them," but it held this insufficient to satisfy the statute, concluding the approved programs "failed to exercise due diligence as to which employers were 'willing to abide by the applicable apprenticeship standards' as required under Labor Code section 3075[, subdivision] (b)(2)." The Council found the approved programs employed a "dual standard" in dispatching apprentices to signatory and nonsignatory employers, tolerating the transfer of apprentices away from public works by signatory employers. The majority found this to constitute "neglect" and to be "proof of an unmet need for apprentices on public works jobs, as seen in the fact that signatory employers were not using apprentices on public works jobsites." The majority also agreed with the Chief that the job opening projections demonstrated insufficient capacity in the approved programs.

A majority of the full Council accepted the recommendation of the three-member panel and affirmed the Chief's approval of the Laborers Committee program. (Cal. Code Regs., tit. 8, § 203, subd. (a)(5).) The Existing Committees challenged the Council's decision in a petition for writ of mandate in the superior court. In an extensive statement of decision, the trial court affirmed the Council's decision.

## II. DISCUSSION

The Existing Committees contend the Chief and Council erred in finding "training needs" sufficient to justify the approval of the Laborers Committee program under section 3075, subdivision (b)(2) because the approved programs (1) could not be found to have "neglect[ed] or refus[ed] . . . to dispatch sufficient apprentices" solely on the basis of evidence that local public works employers were not complying with their statutory obligations under section 1777.5 to hire apprentices; (2) could not be found to lack the capacity to satisfy apprenticeship needs on the basis of projections of future demand for apprentices; and (3) could not be found to lack the capacity to satisfy apprenticeship needs on the basis of private demand for apprentices, as opposed to demand from public works. Both the Council and the Laborers Committee have filed briefs in opposition. Because our resolution of the Existing Committees' first argument requires affirmance of the judgment, we do not reach their second and third arguments.

## A. *Standard of Review*

The Existing Committees and the Council argue we must decide whether review of the Council's decision is governed by Code of Civil Procedure section 1085, traditional mandamus, or Code of Civil Procedure section 1094.5, administrative mandamus, in order to determine the appropriate standard of review. We find it unnecessary to resolve this issue.

Because the Council's decision falls between the statutory cracks of writ review, the choice between Code of Civil Procedure sections 1085 and 1094.5 is not straightforward. It is generally recognized that traditional mandamus under section 1085 applies to "[q]uasi-legislative" decisions, defined as those involving " 'the formulation of a rule to be applied to all future cases,' " while administrative mandamus under section 1094.5 applies to "quasi-judicial" decisions, which involve " 'the actual application of such a rule to a specific set of existing facts.' " (*Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1389 [61 Cal.Rptr.2d 297].) The decision to approve an apprenticeship program, based as it is on the application of section 3075 and the DAS regulations to the particular circumstances of the relevant programs, is far more adjudicatory than legislative in nature, placing it in the natural domain of Code of Civil Procedure section 1094.5. Yet because the Chief and the Council are not *required* to hold a hearing before approving or denying approval of an apprenticeship program (see § 3075, subd. (a); Cal. Code Regs., tit. 8, § 212.2, subds. (h), (*l*)), their decisions do not fall within the literal language of that section, which applies only to decisions rendered "as the result of a proceeding in which by law a hearing is required to be given[ and] evidence is required to be taken" (Code Civ. Proc., § 1094.5, subd. (a)). As a result, it is not readily apparent which statute should apply.

We need not resolve this dilemma because the standard of review applicable to the particular issues raised by the Existing Committees is not dependent on the type of writ review. (See, e.g., *State Bd. of Chiropractic Examiners v. Superior Court* (2009) 45 Cal.4th 963, 977 & fn. 3 [89 Cal.Rptr.3d 576, 201 P.3d 457] [declining to decide between Code Civ. Proc., §§ 1085 and 1094.5 when unnecessary to the resolution of the appeal].) Each of the Existing Committees' three arguments contends the Chief and Council erred in interpreting section 3075. When reviewing an administrative agency's interpretation of a governing statute, including the type of informal interpretation embodied in the decision under review, we must "independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).) The degree of "respect" accorded the agency's interpretation is

" ' "not susceptible of precise formulation, but lies somewhere along a continuum," ' " or, in other words, is *"situational."* (*Id.* at pp. 7, 12.) Under *Yamaha,* the degree of deference due an agency's interpretation depends upon two factors. First, the interpretation is entitled to significant deference if " 'the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " (*Id.* at p. 12.) Second, the interpretation is entitled to even greater deference if it is the result of high-level, formal agency decisionmaking. (*Id.* at p. 13.)

Because the Council's decision was the product of an agency with special expertise, operating in a complex area of commerce, the Council's interpretation deserves significant deference under the first *Yamaha* factor. While the relevant statute and regulations appear straightforward, an approval decision requires the Chief and the Council to balance the sometimes conflicting interests of journeypersons and apprentices, unionized and nonunion workers, and signatory and nonsignatory employers, as well as the interests of the existing and applicant program sponsors. Many of these dynamics are apparent only to those working closely within local labor relations and emerge only dimly from the administrative record. Every approval decision is therefore " 'entwined with issues of fact, policy, and discretion' " (*Yamaha, supra,* 19 Cal.4th at p. 12), counseling us to give " ' "great weight and respect" ' " to the views of the agency.[4] (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 461 [142 Cal.Rptr.3d 581, 278 P.3d 838].) In taking into account the agency's views, however, we recognize the " ' "ultimate responsibility for the construction of the statute" ' " is ours. (*Ibid.*)

## B. *The Statutory Language*

■ It is not disputed the Chief and Council could not approve the Laborers Committee program unless they found that "training needs" in the proposed geographic area justified approval. (§ 3075, subd. (a).) In turn, "training needs" are defined very precisely by the Act. Under section 3075, subdivision (b), training needs justify approval of a program "only if" there is no existing approved program (*id.,* subd. (b)(1)); all existing programs "have been identified by the [Council] as deficient in meeting their obligations under this chapter" (*id.,* subd. (b)(3)); or the existing approved programs "do not have the capacity, or neglect or refuse, to dispatch sufficient apprentices to qualified employers at a public works site who are willing to abide by the

---

[4] Because the Council's approval of the Laborers Committee program was the result of a relatively informal process, this is not the type of formal interpretation deserving even greater deference under the second *Yamaha* factor.

applicable apprenticeship standards" (*id.,* subd. (b)(2)). There is no dispute the first two statutory criteria are inapplicable, leaving only subdivision (b)(2).

The Existing Committees dispute the Council's conclusion that the approved programs "neglect[ed] or refus[ed] . . . to dispatch sufficient apprentices to qualified employers," arguing this requirement was satisfied as a matter of law because they supplied apprentices whenever, and to the extent requested, by public works employers.[5] The Council took a more expansive view of the statutory requirement, finding the approved programs negligent because they tolerated the transfer of apprentices from public to private worksites by signatory employers without replacing the apprentices on the public works sites, thereby tolerating the underemployment of apprentices on public works sites. According to the Council, this was "proof of an unmet need for apprentices on public works jobs," since some signatory employers were not employing apprentices on public works jobsites.

In interpreting the statute, we begin with its language; if there is no ambiguity, the inquiry ends there. (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394 [117 Cal.Rptr.3d 377, 241 P.3d 870].) The relatively arcane language of subdivision (b)(2) of section 3075—"to dispatch sufficient apprentices to qualified employers at a public works site who are willing to abide by the applicable apprenticeship standards"—must be understood by reference to the other statutes governing apprentice labor. Of the various material terms in section 3075, subdivision (b)(2), only "apprenticeship standards" is elsewhere defined.[6] Under the Council's regulations, each approved program must adopt apprenticeship standards covering a wide range of matters. (§ 3071; Cal. Code Regs., tit. 8, § 212.) The standards thus constitute a sort of charter for the operation of the program. (See Cal. Code Regs., tit. 8, § 205, subd. (f).) One of the matters that must be addressed in the standards is the ratio of apprentice to journeyperson labor required on public works. (Cal. Code Regs., tit. 8, § 212, subd. (a)(6).) An approved program can establish a ratio exceeding the one-to-five hourly ratio specified in the statute, but the ratio cannot be less. (§ 1777.5, subds. (g), (i).) Once

---

[5] This premise of the argument is not entirely correct. The Laborers Committee cites seven examples from the record of requests for apprentices the approved programs did not entirely fill and four examples of delayed responses. The Council did not rely on this evidence, and we find the failures slight enough to be immaterial.

[6] Apprenticeship program standards are defined as "that written document containing among other things all the terms and conditions for the qualification, recruitment, selection, employment and training, working conditions, wages, employee benefits, and other compensation for apprentices and all other provisions and statements including attachments as required by the Labor Code and this Chapter which, when approved by the Chief [of] DAS, shall constitute registration of such, and authority to conduct that program of apprenticeship in the State of California." (Cal. Code Regs., tit. 8, § 205, subd. (f).)

established, the ratio contained in the apprenticeship standards operates as a cap on contractors' use of apprentices, just as the one-to-five ratio is a floor. (§ 1777.5, subd. (g) [contractors cannot exceed use of apprentices allowed by apprenticeship standards].)

 The phrase "qualified employers at a public works site who are willing to abide by the applicable apprenticeship standards" in section 3075, subdivision (b)(2) appears to draw its meaning from section 1777.5, the prevailing wage law statute governing apprentice employment. To obtain apprentices to satisfy the requirements of section 1777.5, a contractor on a public work "may apply to any apprenticeship program . . . that can provide apprentices to the site of the public work for a certificate approving the contractor under the [applicable] apprenticeship standards . . . ." (*Id.*, subd. (d).) Certification effectively requires the contractor to agree to be bound by the program's apprenticeship standards. (*Id.*, subd. (i).) Once the certificate has been granted, "[t]he apprenticeship program or programs . . . shall arrange for the dispatch of apprentices to the contractor." (*Id.*, subd. (d).) Thereafter, certified contractors must adhere to the ratio established in the apprenticeship standards for employing apprentices and journeypersons. (§ 1777.5, subds. (g), (i).) The phrase "qualified employers" is not defined and does not appear elsewhere in the Labor Code, but it presumably refers to employers who have been certified to receive apprentices by an approved program under section 1777.5, subdivision (d). Because all public works contractors are required to hire apprentices from approved programs, and because all such contractors must agree to be bound by apprenticeship standards in order to obtain apprentices, the phrase "qualified employers at a public works site who are willing to abide by the applicable apprenticeship standards" in section 3075, subdivision (b)(2), effectively refers to all public works contractors who "choose" to abide by section 1777.5.

Subdivision (b)(2) of section 3075 therefore allows approval of a new apprenticeship program if the existing approved programs "do not have the capacity, or neglect or refuse, to dispatch sufficient apprentices to" law-abiding public works contractors. Applying that construction, we find the literal language of the statute to be consistent with the positions of both parties. As the Existing Committees argue, it is plausible to construe the phrase "sufficient apprentices" to mean "sufficient to satisfy the requests of the public works contractors." On the other hand, it is at least as plausible to construe the term "sufficient" to mean, as the Council believed, "sufficient to allow compliance with legal requirements for the use of apprentices on public works sites." Because the language of the statute in isolation is consistent with both interpretations, it does not resolve the dispute.

## C. *Other Interpretive Aids*

■ When, as here, the statutory language is ambiguous, we are instructed to turn to " ' "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." [Citation.] After considering these extrinsic aids, we "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063 [116 Cal.Rptr.3d 530, 239 P.3d 1228].)

The legislative history of section 3075, subdivision (b)(2) is as unrevealing as the face of the statute. The current version of section 3075 was enacted in 1999 as part of Assembly Bill No. 921 (1999–2000 Reg. Sess.), a much larger revision of several provisions of the Labor Code relating to apprentices, including section 1777.5. (Stats. 1999, ch. 903, § 7, p. 6613.) The prior version of section 3075 had allowed approval of an apprenticeship program "whenever the apprentice training needs justifies [*sic*] the establishment" of the new program, but it did not define "training needs." (See Stats. 1984, ch. 330, § 3, pp. 1596–1597.) In 1992, the Supreme Court found a DAS regulation defining "training needs" to be preempted by federal law (*Southern Cal., supra,* 4 Cal.4th at pp. 428–429, 433), and new subdivision (b) of section 3075 supplanted that regulation.[7] The introductory section of the amending legislation states: "It is the purpose and goal of this legislation to strengthen the regulation of apprenticeship programs in California, to ensure that all apprenticeship programs approved . . . meet the high standards necessary to prepare apprentices for the workplaces of the future and to prevent the exploitation of apprentices . . . . It is further the intent of the Legislature that apprenticeship programs should make active efforts to recruit qualified men, women, and minorities and train them in the skills needed for the workplace." (Stats. 1999, ch. 903, § 1, pp. 6605–6606.) None of this provides useful guidance in the interpretation of subdivision (b)(2) of section 3075, which was not expressly addressed. The documentation generated in the Legislature during the consideration and passage of the bill is similarly unhelpful.[8]

---

[7] We are unaware of any decision holding the current version of section 3075 to be preempted, and neither party challenges the statute on those grounds in this appeal. Amended section 3075 has, however, caused the United States Department of Labor to withdraw federal recognition of California's program for apprentice regulation. (U.S. Dept. of Labor, Employment & Training Admin., notice, 72 Fed.Reg. 9590-01 (Mar. 2, 2007).)

[8] As initially introduced, Assembly Bill No. 921's (1999–2000 Reg. Sess.) changes to section 3075 were designed to protect programs sponsored jointly by unions and employers and to discourage the approval of unilateral apprenticeship programs, which were often sponsored by

Section 1777.5, the provision of the prevailing wage law governing apprentices, provides more insight into the Legislature's likely intent. It is too strong to say that section 1777.5 installs approved apprenticeship programs as the policemen of contractors' compliance with prevailing wage laws governing apprentice employment, but the approved programs are clearly intended to be a hall monitor. As noted above, prior to beginning a public work, the statute requires "every contractor [to] submit contract award information to an applicable apprenticeship program that can supply apprentices to the site of the public work. The information submitted shall include an estimate of journeyman hours to be performed under the contract, the number of apprentices proposed to be employed, and the approximate dates the apprentices would be employed." (§ 1777.5, subd. (e).) In addition, within 60 days after completing the work, "each contractor and subcontractor shall submit to the . . . apprenticeship program a verified statement of the journeyman and apprentice hours performed on the contract." (*Ibid.*)

■ One purpose of the information required by subdivision (e) of section 1777.5 is presumably to give the approved programs notice of contractors' upcoming need for apprentice labor, but that cannot have been the Legislature's only purpose. If the intent was solely to provide notice, contractors would need to report only the number and timing of apprentices sought. It would be unnecessary for contractors to state the number of journeyperson hours anticipated, let alone to report their actual apprentice use after project completion. This additional information allows ·the approved program not only to supply apprentices but also to monitor contractors' compliance with the requirements of the prevailing wage law regarding the use of apprentices. With the information supplied in advance of project commencement, the approved program can determine whether the contractor's anticipated use of apprentices will meet the legal requirement; the information supplied after completion allows the program to determine whether, in fact, the contractor met its legal obligation. Because section 1777.5 does not require the contractor to provide this information to DAS or any other regulatory agency, the approved programs appear to be the entities chosen by the Legislature to

---

nonunion employers. The amendments originally stated that if an approved jointly sponsored program had the capacity "to meet the apprenticeship training needs" in a trade and area, a "new unilateral program" would not be approved absent "special circumstances." (Assem. Bill No. 921 (1999–2000 Reg. Sess.) § 7, as introduced Feb. 25, 1999, italics omitted.) This language was deleted entirely before the bill's passage by the Assembly, apparently in response to strong opposition from nonunion employers. (Assem. Bill No. 921 (1999–2000 Reg. Sess.) § 7, as amended May 20, 1999.) When the bill was introduced in the Senate on July 7, 1999, an author's amendment had reintroduced amendments to section 3075, but this time the amendments included subdivision (b) in close to its current form. (Assem. Bill No. 921 (1999–2000 Reg. Sess.) § 6, as amended July 7, 1999.) The bill itself and the documents generated during its consideration reveal nothing about the genesis or intended meaning of the new language.

monitor compliance with the prevailing wage law governing apprentices.[9] This impression is reinforced by the requirement that the approved programs "retain this information for 12 months." (§ 1777.5, subd. (e).)

■ With this background, and giving appropriate deference to the Council's interpretation, we are persuaded the Legislature intended an approved apprenticeship program to do more than passively respond to contractor requests for apprentices in order to claim the protection from competition provided by section 3075. To qualify as a program "dispatch[ing] sufficient apprentices to qualified employers at a public works site," an approved program must dispatch sufficient apprentices to allow contractors to comply with the prevailing wage law governing employment of apprentices on public works sites.

In addition to the agency's expert interpretation, several factors weigh in favor of this interpretation. The first is the close connection between the language of section 3075, subdivision (b)(2) and the prevailing wage law provisions mandating apprentice employment on public works. As discussed above, section 3075, subdivision (b)(2) cannot be understood apart from section 1777.5, which contains this requirement. Further, subdivision (b)(2) of section 3075 refers to the dispatch of apprentices to employers *only* on public works sites. Since employers on private sites may use apprentices, but are under no statutory mandate to do so, the exclusive reference to dispatching apprentices to employers on public works suggests the subdivision was intended to promote satisfaction of the statutory requirement.

Second is the importance of section 1777.5 in fostering apprenticeship. Work is critical to apprentices, if only because an apprentice cannot advance to journeyperson status without on-the-job training. The prevailing wage law's requirement to employ apprentices on public works was intended to ensure an opportunity for apprentices to obtain such training, and it is a tailormade means for apprenticeship programs to find the work needed to advance their trainees toward graduation.

The third factor is the special role of apprenticeship programs under the prevailing wage law. As discussed above, the Legislature has ensured that approved programs will have the necessary information to monitor compliance with this critical law and promote maximum opportunities for their apprentices. Approved apprenticeship programs are in a unique position to advocate for the use of apprentices in the industry, since they are in regular

---

[9] Under section 1777.5, subdivision (e), contractors must, if requested, provide the information to the contracting agency, but there is nothing requiring its submission to the DAS.

contact with employers and are often sponsored by them. Apprentices themselves lack the information and bargaining position to ensure their employment, and employers and trade unions may have other, potentially conflicting, priorities.

We find confirmation for our interpretation in the actual apprenticeship standards of the approved programs here. During the administrative hearing one of the Council's panel members asked a witness for the Existing Committees whether "[i]n your Standards it says it's the committee's responsibility to use every effort to make sure the apprentices are continuously or reasonabl[y] continuously employed." The witness conceded that was "[c]orrect." Accordingly, the approved programs' own standards describe their mission as requiring more than merely responding to contractor requests. Rather, the approved programs require themselves to "use every effort" to find work for apprentices. "Every effort" surely includes active attempts to prevent illegal underemployment of apprentices by public works contractors.

■ Approved programs, of course, have no legal authority to *compel* compliance with the prevailing wage law, but that does not prevent them from dispatching a sufficient number of apprentices to allow contractors to comply with the law, based on the information they receive. Further, there is a wide range of activities an approved program can pursue to encourage compliance from the contractors in its area. Because approved programs are provided information from which they can readily estimate the demand for apprentices at every public work, they can, at a minimum, monitor requests for apprentices at such sites to ensure an appropriate request is made and contact and encourage deficient employers to fulfill their statutory duty. Based on the postcompletion information, they can also contact noncompliant contractors to prevent future failures. As a last resort, an approved program can report noncompliant contractors to the DAS. Whether a particular program's efforts to dispatch sufficient apprentices are adequate to qualify under section 3075, subdivision (b)(2) is for the Chief and the Council to determine in the exercise of their regulatory discretion.

■ The Existing Committees argue they had no duty to ensure proper employment of apprentices by public works contractors, since responsibility for compliance with the prevailing wage laws lies with the individual contractors, not with the local apprenticeship programs. (See, e.g., § 1777.5, subd. (n).) We agree, but duty is not the issue here. Rather, the approved programs are attempting to claim the protections from competition of section 3075. In order to qualify for *exclusivity* under section 3075, subdivision (b)(2), an approved program must demonstrate it has done more to promote apprentice employment and obtain contractor compliance with prevailing wage laws than merely respond to contractor requests. The Existing Committees must demonstrate their diligence in this regard not because

they had a legal duty to be diligent but because such diligence is a prerequisite to preserving an approved program's monopoly.

### D. *The Council's Decision*

With that understanding, we examine the activities of the approved programs in this matter. While we are required to exercise independent judgment regarding an agency's statutory interpretation, giving due deference to the agency's views, we apply a different standard of review when evaluating the agency's application of its governing statute to particular circumstances. Under both Code of Civil Procedure sections 1085 and 1094.5, we evaluate the agency's exercise of judgment for abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b); *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 585–586 [86 Cal.Rptr.3d 1] [Code Civ. Proc., § 1085].) While the Existing Committees and the Attorney General contend the standards under these two statutes differ, we find "no practical difference between the standards of review applied under traditional or administrative mandamus." (*Friends of the Old Trees v. Department of Forestry & Fire Protection, supra*, 52 Cal.App.4th 1383, 1389, fn. omitted.)[10]

The approved programs were aware, both actually and constructively, that public works contractors in their area were flouting the prevailing wage law with respect to the employment of cement mason apprentices. The Laborers Committee provided the Council with evidence of the underuse of apprentices at fully 85 percent of public works jobsites drawn at random from within the area of responsibility of the approved programs. The number of violations was too large to be passed off as occasional or accidental.[11] Yet beyond sending what appears to have been a form letter notifying contractors of their legal obligations, the approved programs did nothing to promote compliance with the prevailing wage law governing employment of apprentices. Contrary to their own standards' requirement to "use every effort" to secure apprentice employment, the approved programs demonstrated what can only be characterized as indifference to the full employment of apprentices within their trade. Based on this record, the Council did not abuse its discretion in concluding the approved programs neglected or failed to dispatch sufficient apprentices under section 3075, subdivision (b)(2) and were undeserving of exclusivity under that section.

---

[10] The Existing Committees agree that the proper standard of review is abuse of discretion. The Attorney General argues for "arbitrary and capricious," but in the context of the review of an agency adjudication, such as the decision under review, that standard is indistinguishable from an abuse of discretion review. (See *O.W.L. Foundation v. City of Rohnert Park, supra*, 168 Cal.App.4th at pp. 585–586 [characterizing the "arbitrary and capricious" standard of review as "abuse of discretion"].)

[11] While exemptions from the one-to-five requirement can be granted (§ 1777.5, subd. (k)), there was no showing any of these contractors had qualified for a certificate of exemption.

Because we conclude the Council's decision was supported on this ground, it is unnecessary for us to address the Chief's and Council's alternative finding that the approved programs lacked "capacity" under section 3075, subdivision (b)(2).

## III. DISPOSITION

The trial court's judgment denying a writ of mandate is affirmed.

Marchiano, P. J., and Dondero, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 12, 2013, S209863.