Filed 1/22/25

CERTIFIED <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, INC., et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>DEPARTMENT OF INDUSTRIAL RELATIONS et al.,<br><br>  Defendants and Respondents. | C098009<br><br>(Super. Ct. Nos. 34-2021-80003735-CU-WM-GDS, 34-2021-80003714-CU-WM-GDS & 34-2021-80003715-CU-WM-GDS) |
| CONSTRUCTION EMPLOYERS' ASSOCIATION et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>DEPARTMENT OF INDUSTRIAL RELATIONS et al.,<br><br>  Defendants and Respondents. | |

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III and IV.

1

LABORERS TRAINING AND RETRAINING
TRUST OF SOUTHERN CALIFORNIA et al.,

        Plaintiffs and Appellants,

    v.

DEPARTMENT OF INDUSTRIAL RELATIONS et
al.,

        Defendants and Respondents.

APPEAL from a judgment of the Superior Court of Sacramento County, Stephen P. Acquisto, Judge. Affirmed.

Cox, Castle & Nicholson, Dwayne P. McKenzie, John S. Miller, Jr., Jamie L. Sprague, and Kevin M. Hannifan for Plaintiffs and Appellants Associated General Contractors of California, Inc., Southern California Contractors Association, Inc., and Building Industry Association of Southern California, Inc.

Cook Brown, Ronald Brown, Barbara A. Cotter, Alexis M. Gabrielson, and Zachary H. Rankin for Plaintiff and Appellant Construction Employers' Association.

Simpson, Garrity, Innes & Jacuzzi, Paul V. Simpson and Sean R. Broderick for Plaintiffs and Appellants United Contractors and Millwright Employers Association, Inc.

Weinberg, Roger & Rosenfeld, Matthew J. Gauger, Andrea Matsuoka and Kristina L. Hillman for Plaintiffs and Appellants The Board of Trustees in their capacities as Trustees of the Laborers Training and Retraining Trust Fund for Northern California, Mark Ashford, Juan Andrade, Johnny Bonville and Northern California Carpenters Training Trust Fund.

Reich, Adell & Cvitan, Alexander B. Cvitan, William Y. Sheh, Aaron G. Lawrence, and Illissa B. Gold for Plaintiffs and Appellants The Board of Trustees in their capacities as Trustees of the Laborers Training and Retraining Trust of Southern California, Elijah Keane, Manuel Ruiz, and Alexis Feria.

Rob Bonta, Attorney General, Jonathan L. Wolff, Chief Assistant Attorney General, Lisa W. Chao, Supervising Deputy Attorney General, Charles J. Keith and Hutchison B. Meltzer, Deputy Attorneys General, for Defendant and Respondent Department of Industrial Relations.

Keker, Van Nest & Peters, Steven A. Hirsch and Reaghan E. Braun for Defendant and Respondent California Apprenticeship Council.

Altshuler Berzon, Scott A. Kronland and Eileen B. Goldsmith for California State Association of Electrical Workers as Amicus Curiae on behalf of Defendant and Respondent California Apprenticeship Council.

This appeal involves a challenge to amended regulations issued by the California Apprenticeship Council (the Council or Council) to implement Labor Code section 1777.5,[1] a prevailing wage law governing the employment of apprentices on public works projects.

Section 1777.5 promotes apprenticeship by requiring public works contractors who employ workers in "any apprenticeable craft or trade" to also employ a certain ratio of apprentices to experienced "journeymen" workers. (§ 1777.5, subds. (d), (g), (h).) For employers, a key benefit is that workers participating in state-approved apprenticeship programs can be paid a lower apprentice wage rate. (§ 1777.5, subds. (b)(1) & (c); *Henson v. C. Overaa & Co.* (2015) 238 Cal.App.4th 184, 189 (*Overaa*) ["If the Prevailing Wage Law required contractors to pay all employees union wages, it would present a significant obstacle to the hiring and training of lesser-skilled apprentices"].)

Before the challenged regulatory amendments, disputes arose about whether an apprentice's craft or trade should be defined by the *type of work* carried out by journeyworkers in the *same occupation*, or instead should be based on the *work processes* on which apprentices were expressly approved to train. (See *Overaa, supra*, 238 Cal.App.4th at pp. 188-194.) In *Overaa*, the Court of Appeal, First Appellate District, Division One, held that an apprentice's craft or trade is defined by the type of work carried out by the journeyworkers and other members of the union sponsoring the apprentice's training program. (*Id.* at p. 194.)

---

[1] Undesignated section references are to the Labor Code.

3

Several years after (and notwithstanding) the *Overaa* decision, the Council adopted the challenged regulations providing that, to qualify for the apprentice wage rate, apprentices must be performing work processes included in the apprentice's approved training program.  (Cal. Code Regs., tit. 8 (8 CCR), §§ 205, subds. (c), (p), (q), 230.1, subd. (c).)  The stated purpose of the amendments was to "ensure that the work performed by apprentices on public works is a genuine part of their training program leading to fully competent journey-level status, and conversely that apprentices will not be used as a source of cheap labor for work processes that are not part of their structured, state-approved training program."

Associated General Contractors of California, Inc., et al. and Construction Employers' Association et al. (the employer petitioners), with Laborers Training and Retraining Trust of Southern California et al. (the program petitioners, and collectively petitioners), filed petitions and complaints (petitions) challenging the validity of the new regulations.  The trial court denied the petitions.

On appeal, petitioners contend the trial court's judgment should be reversed because (1) the challenged regulations exceed the scope of the Council's rulemaking authority, (2) the regulations are inconsistent with the governing law, (3) the regulations violate the Administrative Procedure Act's (APA) (Gov. Code, § 11340 et seq.) clarity standard, and (4) the Council failed to adequately assess and disclose the regulations' potential adverse economic impacts.

In the published portion of this opinion, we conclude that the regulations are within the scope of the Council's rulemaking authority and consistent with the governing law.  In reaching this conclusion, we depart somewhat from the *Overaa* court's interpretation of section 1777.5.  In the unpublished part of the opinion, we reject petitioners' remaining contentions.  Accordingly, we affirm.

LEGAL BACKGROUND

A.     *The Shelley-Maloney Act*

"It is the public policy of this state to encourage the utilization of apprenticeship as a form of on-the-job training." (§ 3075.1.)  In furtherance of this goal, California has enacted laws intended to promote and foster the development of apprenticeship training programs.  (*Southern California Cement Masons Joint Apprenticeship Committee v. California Apprenticeship Council* (2013) 213 Cal.App.4th 1531, 1536-1537 (*Cement Masons*).)  " 'The basic idea of an apprenticeship [training] program is to allow on-the-job training for apprentices who work under the supervision of journeymen and thus to encourage and assist persons to enter into the skilled work force . . . .' " (*Overaa, supra*, 238 Cal.App.4th at p. 189.)  An apprentice who completes an approved apprenticeship program obtains a certificate naming him or her a skilled journeyworker, eligible for higher wage rates.  (*Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship Council* (1992) 4 Cal.4th 422, 429 (*Associated Builders*); 8 CCR, § 224.)

California regulates programs for the training of apprentices under the Shelley-Maloney Apprentice Labor Standards Act of 1939 (the Shelley-Maloney Act), codified at section 3070 et seq.  (*Cement Masons, supra*, 213 Cal.App.4th at p. 1535.)  Under the act, oversight of apprenticeship programs is vested in two entities within the Department of Industrial Relations (DIR): the Division of Apprenticeship Standards (Division) and the Council.  (*Overaa, supra*, 238 Cal.App.4th at pp. 189-190; §§ 3070, 3073.)  The Division administers the apprenticeship law, acts as secretary to the Council, and approves apprenticeship programs.  (*Associated General Contractors of America v. San Diego Unified School Dist.* (2011) 195 Cal.App.4th 748, 760; §§ 3073, 3073.1, 3075, 3090; 8 CCR, § 212.)  The Council, a public body established within the Division, is empowered to issue rules and regulations establishing standards for apprentice agreements in the building and construction trades.  (*Overaa*, at p. 190; § 3071.)

5

Pursuant to the Shelley-Maloney Act, the process for approving an apprenticeship program begins when an application is submitted to the Chief of the Division by a program "sponsor." (*Associated Builders, supra*, 4 Cal.4th at pp. 433-434; § 3075, subd. (a); 8 CCR, §§ 212, 212.2, subd. (a), 218.) A variety of entities may sponsor an apprenticeship program, including a joint apprenticeship committee, a unilateral management or labor apprenticeship committee, or an individual employer. (§ 3075, subd. (a).)

State approval is not required for a sponsor to operate an apprenticeship program. (*Associated Builders, supra*, 4 Cal.4th at p. 428; *Rodriguez v. RWA Trucking Co., Inc.* (2013) 238 Cal.App.4th 1375, 1401.) However, strong financial incentives exist for apprenticeship programs to obtain state approval. (*Associated Builders,* at pp. 428-429.) For example, only apprentices from approved programs are eligible to be employed at the apprentice wage rate on public works. (§ 1777.5, subd. (c).)

A sponsor wishing to establish a state-approved apprenticeship program must submit written program standards to the Division. (8 CCR, §§ 212, 212.2, subd. (a).) To obtain approval, those standards must describe the program's geographic area of operation; the duties of the apprentice; the working conditions unique to the program; the apprentice's wage progression and other compensation; the length of the apprenticeship; the " related and supplemental instruction " to be provided to the apprentice;[2] and other matters. (8 CCR, §§ 205, subd. (f), 212, subd. (a); § 3078.5.) The standards also must include a statement of the apprenticeable "occupation(s)" and "an outline of [all] the work processes in which the apprentice will receive supervised work experience and training on the job[,]" as well as evidence of the program's "ability to offer training and

---

[2]  " 'Related and supplemental instruction' " means "an organized and systematic form of instruction designed to provide the apprentice with knowledge including the theoretical and technical subjects related and supplemental to the skill(s) involved." (8 CCR, § 205, subd. (h).)

6

supervision in all work processes of the apprenticeable occupation." (8 CCR, §§ 212, subd. (a)(1), 212.2, subd. (a)(4).)

A person who wishes to work as an apprentice in an approved program must sign an "apprentice agreement" with the program sponsor. (§§ 3077-3079.) By statute, every apprentice agreement must contain or incorporate by reference a statement of the craft or trade in which the apprentice is to be taught; the number of hours to be spent in work; the learning objectives to be accomplished through related and supplemental instruction; and a schedule of the processes in the trade or industry divisions in which the apprentice is to be taught. (§ 3078; see also § 3078.5 [term of apprenticeship].)

Once an apprenticeship program has been approved, the Shelley-Maloney Act protects it against competition from other apprenticeship programs. (*Kern*, *Inyo & Mono Counties Plumbing, etc. v. California Apprenticeship Council* (2013) 220 Cal.App.4th 1350, 1354 (*Kern*, *Inyo & Mono Counties Plumbing*).) Under section 3075, subdivision (b), a new apprenticeship program in the building and construction trades can be approved only if one or more of the following conditions are met: (1) there is no existing approved program serving the same craft or trade and geographic area; (2) the existing approved program (serving the same craft or trade and geographic area) has been identified as deficient; or (3) the existing approved program "do[es] not have the capacity, or neglect[s] or refuse[s], to dispatch sufficient apprentices to qualified employers at a public works site." (§ 3075, subd. (b)(1)-(3); *Kern*, *Inyo & Mono Counties Plumbing*, at p. 1354.) An existing apprenticeship program "serves the 'same craft or trade' as a proposed apprenticeship program when there would be substantial overlap in the work processes covered by the programs or when graduates of the existing program would be qualified to perform a substantial portion of the work that would be performed by graduates of the new program." (§ 3075, subd. (c).)

The Division must audit existing apprenticeship programs to ensure, among other things, that they are complying with its standards, that all required classroom instruction

is being provided, that all work processes in the standards are being covered, and that apprentices are graduating from the program on schedule.  (§ 3073.1, subd. (a); *Kern, Inyo & Mono Counties Plumbing, supra*, 220 Cal.App.4th at p. 1355.)

B.      *The Prevailing Wage Law*

California's "Prevailing Wage Law" (§ 1770 et seq.) is a statutory scheme designed to enforce minimum wage standards on construction projects funded in whole or in part with public money.  (*Vector Resources, Inc. v. Baker* (2015) 237 Cal.App.4th 46, 54.)  In general, it requires that workers employed on public works be paid not less than the "prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed."  (§ 1771.)  The law's purpose "is to benefit and protect employees on public works projects."  (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987.)  "This general objective subsumes within it a number of specific goals:  to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees."  (*Ibid*.)

The Director of the DIR (the DIR Director) is responsible for determining the prevailing wage rate for each craft, classification, or type of work.  (§§ 1770, 1773.)  The DIR Director's determination of the prevailing wage is to be based on the applicable wage rates established by collective bargaining agreements (CBA's) (and federal public works projects) in the same area, unless those rates "do not constitute the rates actually prevailing in the locality," in which case the DIR Director is to "obtain and consider [other] data from the labor organizations and employers or employer associations concerned . . . ."  (§§ 1773, 1773.9; *Independent Roofing Contractors v. Department of Industrial Relations* (1994) 23 Cal.App.4th 345, 351.)  The body awarding a public

works contract is required to obtain from the DIR Director the prevailing wage rate for each craft, classification, or type of worker needed to execute the contract. (§ 1773.)

Section 1777.5 is the part of the Prevailing Wage Law governing the employment of apprentices on public works projects. (*Cement Masons, supra*, 213 Cal.App.4th at p. 1536.) Section 1777.5 promotes apprenticeship on public works by requiring contractors who hire workers in any "apprenticeable craft or trade" to also hire a certain number of registered apprentices in the same craft or trade. (§ 1777.5, subds. (d), (g) & (h).) As a general rule, contractors are required to employ apprentices at a ratio of no less than one hour of apprentice work for every five hours worked by journeyworkers. (§ 1777.5, subds. (g)-(i); 8 CCR, § 230.1, subd. (a).) To facilitate training, the Prevailing Wage Law requires contractors to "endeavor, to the greatest extent possible, to employ apprentices during the same time period that journeymen in the same craft or trade are employed at the jobsite." (§ 1777.5, subd. (h).)

For contractors, a benefit of hiring apprentices is that they can pay them a special apprentice wage, which is lower than the journeyworker-level prevailing wage rate. (*Associated Builders & Contrs. of S. Cal. v. Nunn* (9th Cir. 2004) 356 F.3d 979, 982-983.) However, only registered apprentices from state-approved programs are eligible to be employed at the apprentice wage rate and therefore "only apprentices from approved programs can satisfy a contractor's statutory duty to employ apprentices on public works." (*Cement Masons*, *supra*, 213 Cal.App.4th at p. 1536; § 1777.5, subd. (c).)

FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Challenged Regulations*

Petitioners challenge the adoption of regulations governing the employment of apprentices on public works projects (Notice of Approval of Regulatory Action, OAL (Office of Administrative Law), Matter No. 2021-0222-02 (Aug. 6, 2021), amending 8 CCR, § 202 et seq. (the regulations). The challenged regulations include several amendments intended to "clarify and make more specific" the conditions under which

9

apprentices will qualify for payment of the apprenticeship wage rate under section 1777.5. (8 CCR, § 227.)

First, the Council amended 8 CCR, section 230.1, subdivision (c), to require that apprentices employed on public works under section 1777.5 be assigned "work that is included in the apprenticeship standards under which the apprentices are training," and no other work. Before the amendment, section 1777.5, subdivision (c), stated, in relevant part: "Apprentices employed on public works can only be assigned to perform work of the craft or trade to which the apprentice is registered. Work of the craft or trade consists of job duties normally assigned to journeymen in the apprenticeable occupation. . . ." (8 CCR, former § 230.1, subd. (c).) Under this language, disputes arose over whether public works contractors could select apprentices based on the job duties normally assigned to journeyworkers in the same occupation, or instead must select apprentices based on the work processes set forth in the apprenticeship program standards under which the apprentice is training. (See *Overaa, supra*, 238 Cal.App.4th at pp. 188-194.) The Council amended the regulation to clarify that, to qualify for apprentice wages on public works, registered apprentices must be performing work that is part of the work processes specifically enumerated in their approved training program.[3]

The Council also revised the definition of " 'Apprenticeable Occupation' " in 8 CCR, section 205, subdivision (c) to tie that definition to the work processes contained in the approved program standards. Before the amendment, an apprenticeable occupation was defined only as "one which requires independent judgment and the application of

---

[3]    As amended, 8 CCR, section 230.1, subdivision (c), provides: "Apprentices employed pursuant to [§ 1777.5] shall be registered apprentices who are training under apprenticeship standards that include the work processes that the contractor will perform on the project. Contractors must assign apprentices work that is included in the apprenticeship standards under which the apprentices are training. Apprentices on public works cannot be assigned work other than that which is stated in the work processes of the apprenticeship standards under which the apprentices are training."

manual, mechanical, technical, or professional skills and is best learned through an organized system of on-the-job training together with related and supplemental instruction." (8 CCR, former § 205, subd. (c).) The amendment added a sentence stating that "[e]ach '[a]pprenticeable [o]ccupation' is defined by the work processes contained in the approved apprenticeship standards under which apprentices are training." (8 CCR, § 205, subd. (c).)

Finally, the Council amended 8 CCR, section 205, to add new definitions for the terms " '[w]ork [p]rocess' " and " '[r]egistered [a]pprentice.' " (*Id.*, subd. (p) & (q).) As amended, 8 CCR, section 205 defines " '[w]ork [p]rocess' " as "a skill or task, stated in [a] program's apprenticeship standards, in which the apprentice will receive supervised work experience and training on the job." (*Id.*, subd. (p).) It defines a " '[r]egistered [a]pprentice' " as someone "training under and in accordance with apprenticeship standards that have been approved by the Chief [of the Division], and who is party to an apprentice agreement that has been accepted by the [Division]." (*Id.*, subd. (q).)

In the initial statement of reasons for the regulations, the Council explained that the purpose of the amendments was to "ensure that the work performed by apprentices on public works is a genuine part of their training program leading to journey-level status, and conversely that apprentices will not be used as a source of cheap labor for work processes that are not part of their structured and approved training program." According to the Council, the amendments will "close a loophole where the contractor and its journey-level workers were performing work that they were qualified to do . . . but its registered apprentices . . . were used for work processes that were not part of their approv[ed] training program." The Council described its amendments as providing clear and specific "guidance on what craft or trade an apprentice belongs to when performing a particular type of work and what wage must be paid to that apprentice on a public works project."

11

After the Council released its initial statement of reasons, contractors, unions, program sponsors, and others submitted comments in support of, or in opposition to, the proposed amendments. Several commenters raised concerns that the proposed regulations were unauthorized, that they conflicted with the Shelley-Maloney Act and/or Prevailing Wage Law, and that they were burdensome and impractical.

After holding a public hearing, and responding to the comments received, the Council adopted the regulations without change and submitted them to the OAL, which approved them in 2021.

### B.    *The Petitions and Trial Court's Decision*

Petitioners filed three separate petitions in the trial court challenging the validity of the Council's new regulations.[4] The petitions generally alleged that the regulations were invalid because the Council exceeded its rulemaking authority, the regulations were inconsistent with the Prevailing Wage Law and Shelley-Maloney Act, and the Council failed to comply with the procedural requirements of the APA.

Following two sets of briefings and hearings, the trial court denied the petitions. The trial court concluded (1) the amendments fall within the scope of the Council's lawfully delegated rulemaking authority; (2) the amendments are consistent with the Prevailing Wage Law and the Shelley-Maloney Act; (3) the amendments are reasonably necessary to further the purposes of those laws; and (4) the Council promulgated the amendments in compliance with the requirements of the APA. The petitioners appealed the judgment.

### C.    *Amicus Curiae*

On appeal, we granted a request by the California State Association of Electrical Workers (amicus curiae) for permission to file an amicus curiae brief in support of the

---

[4]    The trial court ordered the three cases related.

Council. California State Pipe Trades Joint Apprenticeship Committee, et al., also sought permission to file an amicus curiae brief in support of the Council, which was denied.

REQUESTS FOR JUDICIAL NOTICE

On December 21, 2023, petitioners filed a request for judicial notice of 15 documents, consisting of older versions of sections of the Labor Code (exhibits 1, 2, 4, 10, 12, 13, and 14); an analysis by the Legislative Analyst on Assembly Bill No. 805, (1968 Reg. Sess.), as amended June 26, 1968 (exhibit 3); various reports prepared by the DIR (exhibits 5, 6, and 7); remarks of Governor Culbert L. Olson and Lieutenant Governor Ellis E. Patterson from the Senate Journal during the Fifty-Third Session, (1939) (exhibit 8); a report prepared by the Federal Committee on Apprenticeship, United States Department of Labor, Apprenticeship Information, (May 1939), pages 88-93 (exhibit 9); documents generated during Senate deliberations for Senate Bill No. 371 (1985-1986 Reg. Sess.), pages 102-111 (exhibit 11); and a filed complaint in the matter *Ventura County Plumbing and Pipefitting Joint Apprenticeship Committee v. Blois Construction, Inc. et al.*, Ventura County Superior Court, case No. 2023CUMC016643 (exhibit 15). We grant the request as to exhibits 1, 2, 3, 4, 10, and 11, but deny it as to exhibits 5, 6, 7, 8, 9, 12, 13, 14, and 15, as those exhibits either are not relevant or are not proper subjects of judicial notice. (Evid. Code, §§ 451, subd. (a), 459, subd. (a); see *Kaufman & Broad Communities*, *Inc. v. Performance Plastering*, *Inc.* (2005) 133 Cal.App.4th 26, 31; *Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7; *California Public Records Research*, *Inc. v. County of Yolo* (2016) 4 Cal.App.5th 150, 176, fn. 12; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2.)

On June 6, 2024, the employer petitioners filed a request for judicial notice of a "received but not filed" copy of the appellants' opening brief in *Overaa, supra*, 238 Cal.App.4th 184. That request is denied.

On July 11, 2024, amicus curiae filed a request for judicial notice of the State of California, DIR, Division of Apprenticeship Standards, Apprentice Agreement, form DAS-1, November 2009, (exhibit A), the Division of Apprenticeship Standards, Minimum Industry Training Criteria for the craft of Commercial/Industrial Electrician, May 2020 (exhibit B), and Division of Apprenticeship Standards, approved program standards for the San Joaquin-Calaveras Counties Electrical Joint Apprenticeship & Training Committee, December 2021, (exhibit C). We grant the request as to exhibits A and B, but deny it as to exhibit C. (Evid. Code, §§ 452, subd. (c), 459, subd. (a).)

DISCUSSION

Petitioners contend the trial court erred in denying their petitions, arguing that the regulations are invalid because (1) the Council exceeded the scope of its rulemaking authority; (2) the regulations are inconsistent with section 1777.5 of the Prevailing Wage Law, section 3086 of the Shelley-Maloney Act, and the overall structure and purposes of the Prevailing Wage Law and the Shelley-Maloney Act; and (3) the Council substantially failed to comply with the requirements of the APA. As we explain, we conclude the regulations are within the scope of the Council's rulemaking authority, the regulations are consistent with controlling law, and the Council substantially complied with the requirements of the APA.

I

*Administrative Procedure Act and Standard of Review*

The APA was enacted in 1979 because the Legislature perceived " 'there existed too many regulations imposing greater than necessary burdens on the state and particularly upon small businesses.' " (*California Forestry Assn. v. California Fish & Game Commission* (2007) 156 Cal.App.4th 1535, 1552-1553; Stats. 1979, ch. 567, § 1.) In adopting the APA, the Legislature declared that "[t]he language of regulations is frequently unclear and unnecessarily complex," and "often confusing to the persons who must comply with the regulations." (Gov. Code, § 11340, subds. (a) & (b).)

14

A key purpose of the APA was to "ensure that those persons or entities whom a regulation will affect have a voice in its creation [citation], as well as notice of the law's requirements so they can conform their conduct accordingly." (*Tidewater Marine Western*, *Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568-569.) To achieve this goal, the APA prescribed "basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations." (Gov. Code, § 11346.) These include notice to the public and affected business and industry groups, a statement of the reasons for the proposed regulatory action, an opportunity for interested parties to comment, the agency's response to comments, and an assessment of the potential for adverse economic impacts on businesses and individuals. (Gov. Code, §§ 11346.2-11346.9; *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 333.)

The Legislature also established the OAL and charged it with the review of proposed regulations. (Gov. Code, §§ 11340.1, subd. (a), 11340.2.) As part of its review, the OAL determines whether the regulations were adopted in compliance with the procedural requirements of the APA. (Gov. Code, §§ 11340.5, 11349.3, subd. (b); *People v. Medina* (2009) 171 Cal.App.4th 805, 813.) The OAL also reviews the proposed regulations for "[n]ecessity," "[a]uthority," "[c]onsistency," and "[c]larity," among other standards set forth in Government Code section 11349.1. (Gov. Code, §§ 11349, 11349.1; *Stoneham v. Rushen* (1984) 156 Cal.App.3d 302, 309, fn. 5.)

The "[n]ecessity" standard corresponds to the requirement that a regulation must be "reasonably necessary" to effectuate the purpose of the statute, court decision, or other provision of law that it implements, interprets, or makes specific. (Gov. Code, §§ 11342.2, 11349, subd. (a); *PaintCare v. Mortensen* (2015) 233 Cal.App.4th 1292, 1304.) The "[a]uthority" and "[c]onsistency" standards reflect two principles. The first is that for a regulation to be valid and effective, it must be "within the scope of authority conferred" on the agency by the enabling statute. (Gov. Code, §§ 11342.1, 11349, subd. (b); *Diageo-Guinness USA*, *Inc. v. Board of Equalization* (2012) 205 Cal.App.4th 907,

15

915.)  The second is that when an agency has the authority to adopt regulations to implement, interpret, make specific, or otherwise carry out the provisions of a statute, the regulations must be consistent with the governing law.  (Gov. Code, §§ 11342.2, 11349, subd. (d); *Agric. Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 420; see *California School Bds. Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 544) [agencies lack "discretion to promulgate regulations that are inconsistent with the governing statute, alter or amend the statute, or enlarge its scope"].)

The " '[c]larity' " standard requires that regulations be "written or displayed so that the meaning of regulations will be easily understood by those persons directly affected by them."  (Gov. Code, § 11349, subd. (c).)  The OAL's own regulations state that a regulation will be presumed not to comply with the " '[c]larity' " standard if, among other things, "the regulation uses terms which do not have meanings generally familiar to those 'directly affected' by the regulation," or "the regulation presents information in a format that is not readily understandable by persons 'directly affected' . . . ."  (Cal. Code Regs., tit. 1 (1 CCR), § 16, subds. (a)(3) & (5).)

Any interested person may challenge the validity of an adopted regulation by bringing an action for declaratory relief, which may be combined with an action for injunctive relief and/or a petition for writ of mandamus.  (Gov. Code, § 11350; *Faunce v. Denton* (1985) 167 Cal.App.3d 191, 196 [injunctive relief]; *California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 302 (*Maxwell-Jolly*) [petition].)  A court *may* declare a regulation invalid if, among other things, (1) it substantially fails to comply with the procedural requirements or substantive standards of the APA, (2) the agency's determination that the regulation is reasonably necessary to effectuate the purpose of the statute being implemented is not supported by substantial evidence, or (3) the agency's determination the regulation will not have a significant adverse economic impact is not supported by substantial evidence.  (Gov. Code, § 11350; *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 755 [violations

justify declaring a regulation invalid only when they constitute a " 'substantial failure to comply' " with the rulemaking procedures]; *Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, 1080-1081 [OAL's findings cannot defeat the court's authority to review for compliance with standards].)

A court *must* declare a regulation void if the regulation is not within the scope of the authority conferred or is inconsistent with the standards prescribed by other laws. (Gov. Code, §§ 11342.1, 11342.2; *Diageo-Guinness USA, Inc. v. Board of Equalization, supra*, 205 Cal.App.4th at p. 920.)

When a regulation is challenged on the ground that it is not reasonably necessary to effectuate the purpose of the statute, appellate review is confined to whether the regulation is arbitrary, capricious, without rational basis, or not supported by substantial evidence. (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415 (*Western States Petroleum*); Gov. Code, § 11350, subd. (b)(1).) Under this standard, "the court's role is limited to determining whether the regulation is 'reasonably designed to aid a statutory objective.' " (*Credit Ins. General Agents Asso. v. Payne* (1976) 16 Cal.3d 651, 657.)[5]

In contrast, when a regulation is challenged on the grounds that it conflicts with a governing statute or exceeds the rulemaking authority delegated by the Legislature, the issue of statutory construction is a question of law on which the court exercises its independent judgment. (*Western States Petroleum, supra*, 57 Cal.4th at p. 415; *GMRI,*

---

[5]    At the Council's request, we invited supplemental briefing concerning the impact of the United States Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo* (2024) ___U.S.___ [219 L.Ed.2d 832], overturning the "*Chevron* doctrine," pursuant to which courts sometimes were required to defer to agency interpretations of statutes even when the court read the statute differently. (*Id*. at p. __ [219 L.Ed.2d 832, 846].) As a federal case decided under the federal APA (5 U.S.C.S. § 551 et seq.), *Loper* has no direct application here. To the extent it has any persuasive value, we find *Loper* to be consistent with our understanding of the standard of review. (*Loper Bright Enterprises*, at p. __ [219 L.Ed.2d 832, 867].)

*Inc. v. California Dept. of Tax & Fee Administration* (2018) 21 Cal.App.5th 111, 124.)
While an agency's interpretation of a statute is entitled to consideration and respect—
particularly when the Legislature has delegated the task of interpreting or elaborating on
a key statutory term—the agency's interpretation is not binding. (*Murphy v. Kenneth
Cole Productions*, *Inc.* (2007) 40 Cal.4th 1094, 1105, fn. 7; *Our Children's Earth
Foundation v. State Air Resources Bd.* (2015) 234 Cal.App.4th 870, 886.) The court, not
the agency, has final responsibility for interpreting the law. (*GMRI, Inc.*, at p. 124;
*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4
(*Yamaha*).)[6]

"Our fundamental task in construing a statute is to ascertain the intent of the
lawmakers so as to effectuate the purpose of the statute." (*Day v. City of Fontana* (2001)
25 Cal.4th 268, 272.) In construing legislative intent, "[t]he statutory language itself is
the most reliable indicator, so we start with the statute's words, assigning them their usual
and ordinary meanings, and construing them in context. If the words themselves are not
ambiguous, we presume the Legislature meant what it said, and the statute's plain
meaning governs. On the other hand, if the language allows more than one reasonable
construction, we may look to such aids as the legislative history of the measure and

---

[6] Citing a treatise and Justice Mosk's concurrence in *Yamaha*, the Council argues there is an " 'important qualification' " to the respectful nondeference standard when the Legislature has specifically delegated to an agency the power to interpret a statute. (*Yamaha, supra*, 19 Cal.4th at pp. 17-18 [Mosk, J., concurring]) In such a scenario, the Council contends, courts must review the correctness of the agency's interpretation under the deferential abuse of discretion test. We are unpersuaded. The majority in *Yamaha* held that even quasi-legislative rules, adopted pursuant to a delegation of legislative power, are reviewed "independently for consistency with controlling law." (*Yamaha*, at p. 11, fn. 4.) In any event, the law is clear that an agency may only exercise delegated power within the framework of the statute under which it is conferred. It is an abuse of discretion for an agency to "promulgate regulations that are inconsistent with the governing statute, or that alter or amend the statute or enlarge its scope." (*Slocum v. State Bd. of Equalization* (2005) 134 Cal.App.4th 969, 974; *Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 170.)

18

maxims of statutory construction.  In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.)

Because a regulation adopted by a state agency is presumed valid (*Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376, 389), the burden is on the party challenging the regulation to establish its invalidity.  (*California School Bds. Assn. v. State Bd. of Education, supra*, 191 Cal.App.4th at p. 544.)

## II

### *Scope of Rulemaking Authority*

Petitioners contend that section 3071 is the only statutory provision delegating rulemaking authority to the Council, and that this statute limits it to establishing "standards for minimum wages, maximum hours, and working conditions for apprentice agreements . . . ."  (§ 3071, subd. (a).)  They further argue that the challenged regulations do not establish standards for apprentice wages, hours, or working conditions, and therefore exceed the scope of the Council's regulatory authority.

The Council responds that the challenged regulations are within the scope of its rulemaking authority under section 3071 and also supported by additional grants of authority set forth in section 1777.5, subdivisions (c) and (d), and section 1777.7, subdivision (g).

We conclude that the challenged regulations fall within the scope of the Council's delegated rulemaking authority under section 3071 because the challenged regulations control the type of work in which apprentices may engage, requiring contractors to assign work according to the work processes set forth in the apprentice's program standards. Petitioners summarily assert that the challenged regulations do not address working conditions, but fail to explain how they reach this conclusion, and we are not obliged to develop the argument for them.  (*Dills v. Redwoods Associates*, *Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1.)  We therefore find the challenged regulations to be

authorized by the grant of authority in section 3071 to establish "standards for

. . . working conditions for apprentice agreements . . . ."  (§ 3071, subd. (a); see also

8 CCR, §§ 210, 212; §§ 3076, 3078.)  Moreover, any doubt about the Council's authority

to adopt the regulations is dispelled by section 1777.5, subdivisions (c) and (d), and

section 1777.7, subdivision (g).  As the trial court found, while these sections do not

expressly grant rulemaking authority, they implicitly recognize that the Council has the

authority to issue regulations relating to the employment and training of apprentices,

including the power to define "apprenticeable occupation" for purposes of employing

apprentices on public works.

We reject the program petitioners' contention that we must construe section 3071

as the only statutory provision delegating rulemaking authority to the Council to avoid

what they frame as "difficult" constitutional questions.[7]  "An unconstitutional delegation

of legislative power occurs if the Legislature confers upon an administrative agency

unrestricted authority to make fundamental policy decisions.  [Citation.]  However, the

doctrine prohibiting delegation of legislative power is not violated if the Legislature

makes the fundamental policy decisions and delegates to an administrative agency the

task of determining how the legislative goals will be achieved.  The Legislature may,

after adopting a policy, confer upon an agency the power to determine the details by

prescribing administrative rules and regulations to promote the purposes of the legislation

and carry it into effect.  [Citations.]  The rule against delegation does not invalidate

reasonable grants of quasi-legislative power to an administrative agency if adequate

safeguards exist to protect against the misuse of that power."  (*American Coatings Assn.*,

*Inc. v. State Air Resources Bd.* (2021) 62 Cal.App.5th 1111, 1130.)  "[T]he standards to

guide adoption of administrative rules and regulations need not be expressly set forth in

---

**7**     Program petitioners raise this argument only as to sections 1777.5 and 1777.7;
they concede that section 3071 includes adequate safeguards.

20

the authorizing statute. [Citation.] They may be implied from the statutory purpose [citations] or related statutes." (*State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 751.)

Here, adequate safeguards can be found in the declared policies and purposes of the Prevailing Wage Law and Shelley-Maloney Act, which include encouraging the cost-effective utilization of apprenticeship as a form of on-the-job training (§ 3075.1); promoting, fostering, and developing the welfare of apprentices (§ 3073); improving the working conditions of apprentices (§ 3073); advancing their opportunities for profitable employment (§ 3073); and strengthening the regulation of apprenticeship programs to ensure that they meet the high standards necessary to prepare apprentices for the workplaces of the future and to prevent the exploitation of apprentices by employers or apprenticeship programs (Stats. 1999, ch. 903 § 1, Assem. Bill No. 921 (1999-2000 Reg. Sess.).) (See *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 716 [a general welfare standard is a sufficient guideline to enable an agency to act constitutionally]; *People v. Martin* (1989) 211 Cal.App.3d 699, 710 [expressed intent to protect public health and environmental quality by regulating hazardous waste provided adequate safeguard]; see also *Clean Air Constituency v. State Air Resources Bd.* (1974) 11 Cal.3d 801, 819 [referencing goals of legislation to avoid unconstitutional delegation].)

Further, to the extent petitioners are challenging the Council's authority to require compliance with work processes in apprenticeship standards, we note that section 3071 provides that the Council "shall issue rules and regulations which establish standards" for apprentice agreements that are no "lower" than those prescribed by the Shelley-Maloney Act. (§ 3071, subd. (a).) Section 3078 of the Shelley-Maloney Act expressly requires apprentice agreements to contain both "[a] statement of the trade, craft, or business which the apprentice is to be taught," and "[a] statement setting forth a schedule of the processes in the trade or industry divisions in which the apprentice is to be taught . . . ." And

21

section 3073.1 authorizes audits of apprenticeship programs to ensure the program evaluated is complying with its standards and that all work processes are being covered. (See *Kern, Inyo & Mono Counties Plumbing, supra*, 220 Cal.App.4th at p. 1355.) These statutes provide further guidance to the Council in the exercise of its rulemaking authority. (See *Carson Mobilehome Park Owners' Ass'n v. City of Carson* (1983) 35 Cal.3d 184, 190 [by stating its purpose and providing a list of factors to be considered, the ordinance provided constitutionally sufficient guidance].)

For these reasons, we find no basis to apply the canon of constitutional doubt.

## II

### *Consistency with Governing Law*

We next consider petitioners' contention that the challenged regulations are invalid because they conflict with section 1777.5 of the Prevailing Wage Law, section 3086 of the Shelley-Maloney Act, and the overall statutory scheme governing the employment of apprentices on public works. We find no conflict.

A. *Section 1777.5*

We begin with the statutory text of section 1777.5, which states, in relevant part, that "[e]very apprentice employed upon public works shall be paid the prevailing rate of per diem wages for apprentices in the trade to which he or she is registered and shall be employed only at the work of the craft or trade to which he or she is registered." (§ 1777.5, subd. (b)(1).) Subdivision (c) of the statute states that only apprentices who are training under approved apprenticeship programs are eligible to be employed at the apprentice wage rate on public works, and that employment and training of each apprentice must be in accordance with either (1) the apprenticeship standards and apprentice agreements under which he or she is training, or (2) the rules and regulations of the Council. (§ 1777.5, subd. (c).) And when a public works contractor employs workers in an "apprenticeable craft or trade," contractors must employ a proportional number of apprentices in the particular craft or trade and "endeavor, to the greatest extent

possible, to employ apprentices during the same time period that the journeymen in the same craft or trade are employed at the jobsite." (§ 1777.5, subds. (d), (g) & (h).)

Petitioners argue the plain language of the statute establishes that an apprentice's craft or trade is defined by the type of work carried out by the journey-level workers in that craft or trade, rather than the work processes described in the apprenticeship program standards. Petitioners point out that this was the conclusion reached by the Court of Appeal in *Overaa, supra*, 238 Cal.App.4th 184. And because the challenged regulations conflict with *Overaa*'s interpretation of section 1777.5, petitioners contend they are invalid.

The Council responds that the challenged regulations do not conflict with section 1777.5, or *Overaa*'s interpretation of it, because section 1777.5, subdivision (d), expressly states that an " '[a]pprenticeable craft or trade,' as used in this section, means a craft or trade determined as an apprenticeable occupation *in accordance with rules and regulations prescribed by the California Apprenticeship Council*." (§ 1777.5, subd. (d), italics added.) We conclude that the Council has the better argument.

In *Overaa*, the First Appellate District resolved a "long-running jurisdictional dispute between the [p]ipefitters [u]nion and the [l]aborers [u]nion over whether the members of the [p]ipefitters [u]nion should have the exclusive right to perform process piping work on municipal water plant projects." (*Overaa, supra*, 238 Cal.App.4th at p. 192.) The appellants in *Overaa* were pipe fitter apprentices who filed a complaint against a general contractor (C. Overaa & Company) alleging that it violated the Prevailing Wage Law and Shelley-Maloney Act by hiring construction craft laborer apprentices instead of pipe fitter apprentices to perform "process piping" work. (*Id*. at pp. 188, 190.) The contractor hired the construction craft laborers to perform the work pursuant to the terms of a CBA with the construction craft laborers union. (*Id*. at p. 190.)

The appellants in *Overaa* did not contest the general contractor's decision to hire construction craft laborers to perform the journey-level work (*Overaa, supra*,

238 Cal.App.4th at p. 194); they instead alleged that the contractor violated the law by hiring construction craft laborer apprentices. (*Id*. at p. 188.) Citing section 1777.5, the appellants asserted that "it is the state-approved written apprenticeship standards that control how a public works contractor must employ and train apprentices" on a public works project. (*Id.*, at pp. 193-194.) The appellants complained that construction craft laborer apprentices were not qualified to work on process piping because the construction craft laborers union's apprenticeship program did not offer instruction and training on process piping. (*Id*. at pp. 190-191, 194.) The appellants argued that the contractor instead should have hired apprentices from an approved pipe fitting apprenticeship program. (*Id*. at p. 191.)

The trial court granted summary judgment in favor of the general contractor, holding that the Prevailing Wage Law only required contractors to hire apprentices who are in the same occupation as the journeyworkers on their projects. (*Overaa, supra*, 238 Cal.App.4th at pp. 188, 191-192, 193.) The appellate court affirmed, holding that "the plain language of [section 1777.5] indicates an apprentice's craft or trade is defined by the type of work carried out by the journeymen and other members of the union sponsoring the apprentice's training program." (*Ibid*.) Thus, because the craft or trade of the journey-level construction craft laborers encompassed process piping work, the court concluded that the contractor properly hired construction craft laborer apprentices to work on the project. (*Id*. at pp. 194-198.)

Petitioners, in this case, contend that the challenged regulations conflict with *Overaa*'s interpretation of the statute because *Overaa* construed the plain language of the statute to mean that an apprentice's craft or trade is tied to the journeyworker's occupation, not the work processes set forth in the approved apprenticeship standards. (*Overaa, supra*, 238 Cal.App.4th at p. 194.) According to the court in *Overaa*, apprenticeship standards "set a floor, not a ceiling," and apprentices are free to receive additional training in processes beyond those expressly listed in their apprenticeship

24

standards. (*Id*. at p. 196.) Thus, if an apprentice identifies as a construction craft laborer and is training in an apprenticeship program sponsored by the construction craft laborers' union, the apprentice may perform any work in which construction craft laborer journeyworkers and other members of the construction craft laborers' union engage. (*Id*. at p. 193.)

Although we agree there is tension between the challenged regulations and *Overaa*'s interpretation of the statute, and acknowledge that OAL might have had grounds to disapprove the regulations on that basis (Gov. Code, §§ 11349, subd. (d), 11349.1, subd. (a)), we decline to invalidate the regulations here because, in our view, *Overaa* was wrongly decided on this point.[8]

The pivotal language is found in section 1777.5, subdivision (d), which provides that when a contractor "employs workers in any apprenticeable craft or trade," the contractor also must hire apprentices from an apprenticeship program in that craft or trade. (§ 1777.5, subd. (d).) Critically, that same subdivision further provides: " 'Apprenticeable craft or trade,' as used in this section, means a craft or trade determined as an apprenticeable occupation in accordance with rules and regulations prescribed by the [Council]." (§ 1777.5, subd. (d).) As interpreted by *Overaa*, this language requires contractors to hire apprentices who are in the same occupation as the journeyworkers employed on the project. On this point, we have no quarrel.

But *Overaa* did not analyze the scope of the Council's authority to promulgate regulations defining the term "apprenticeable occupation" because there was no need to do so—it found that the regulations in place at the time were consistent with the court's interpretation of the "plain language" of the statute. (*Overaa, supra*, 238 Cal.App.4th at

---

[8]     Our conclusion renders it unnecessary to address the issue of whether the Legislature lawfully may delegate to an administrative agency the power to adopt regulations that interpret a key statutory term in a manner inconsistent with an intervening judicial opinion.

25

p. 194.)  In a footnote, *Overaa* characterized section 1777.5, subdivision (d), as merely a means to distinguish "apprenticeable" crafts or trades from other types of crafts or trades. (*Overaa*, at p. 194, fn. 5.)

After *Overaa* was decided, the Council amended its regulations, which now provide that an " '[a]pprenticeable [o]ccupation' " is "defined by the work processes contained in the approved apprenticeship standards under which apprentices are training."  (8 CCR, § 205, subd. (c).)  We see nothing in the statute's plain language that prevents the Council from making this change.  To the contrary, the Council did precisely what section 1777.5 and section 1777.7 imply it may do:  define "apprenticeable occupation" for purposes of employment of apprentices on public works.  (§§ 1777.5, subd. (d), 1777.7, subd. (g).)

In reaching this conclusion, we note that even before the challenged regulations were adopted, apprenticeship standards were required to include a statement of "the occupation(s) and an outline of the work processes in which the apprentice will receive supervised work experience and training on the job . . . ."  (See, e.g., 8 CCR, § 212, subd. (a)(1) & former § 212, subd. (a)(1) (2004).)  Likewise, the Council has long required that apprentices "be assigned to work and learning tasks so that they obtain the diversified training on-the-job provided for in [their] apprenticeship standards."  (See, e.g., 8 CCR, § 210 & former § 210 (2004); see also 8 CCR, § 212.2 & former § 212.2 (2004) [requiring a program sponsor to provide evidence of ability to offer training and supervision in all work processes of the apprenticeable occupation]; § 3078, subd. (e) [requiring every apprentice agreement to contain "a schedule of the processes in the trade or industry . . . in which the apprentice is to be taught"].)  Thus, the practical effect of the amendments was not to impose a new requirement that apprenticeship standards include the work processes within the apprenticeable occupation.  Rather, they ensure that apprenticeship program standards accurately disclose the skills in which apprentices are being trained and that the work performed by apprentices on public works is a genuine

26

part of their training program. So construed, we perceive no conflict with section 1777.5. Contractors must hire apprentices who are in the same occupation as the journeyworkers, as *Overaa* held, but they may only assign apprentices work that is included in the approved apprenticeship standards under which they are training.

B. *Section 3086*

Petitioners next contend that the challenged regulations are inconsistent with section 3086 of the Shelley-Maloney Act, which provides: "Nothing in this chapter or in any apprentice agreement approved under this chapter shall operate to invalidate any apprenticeship provision in any collective bargaining agreement between employers and employees setting up higher apprenticeship standards." (§ 3086.) In *Overaa*, the appellate court construed this language to mean that " 'the Shelley-Maloney Act was only intended to set minimum apprenticeship standards which individual programs are free to supplement.' " (*Overaa, supra*, 238 Cal.App.4th at p. 196.) Based on *Overaa*'s interpretation of section 3086, petitioners contend that CBA's, not the apprenticeship standards, set the relevant "ceiling" on apprenticeship standards. In petitioners' view, the Council's regulations are nothing more than a "backstop" of minimum apprenticeship standards for apprentices who are not subject to CBA's.

We disagree with this interpretation of the statute. Carried to its logical extreme, it would mean that there are effectively no limits on the apprenticeship standards to which parties may agree through collective bargaining. Parties could, for example, agree to require apprentices to work more than the maximum number of hours prescribed by law, even though this is expressly prohibited by section 3078, subdivision (d) and other provisions of the Labor Code (see, e.g., §§ 1391,1392). The Legislature could not have intended section 3086 to be construed so broadly, especially as it relates to whether apprentices may be paid wages lower than the journey-level prevailing wage rate.

To understand how we reach this conclusion, it is helpful to consider the historical context of the statute. (*Kane v. Hurley* (1994) 30 Cal.App.4th 859, 862.) Before the

27

enactment of section 3086 in 1939, apprenticeship was understood as a system where "minors" were bound by "indenture" for a fixed period of time to learn from a "master" in a "mechanical trade or art or the occupation of farming. . . ." (Former § 3070; Stats. 1937, ch. 90.) At that time, section 1777.5 required apprentices to be paid "standard" apprentice wages and to be employed "only at the work of the trade to which [they were] indentured," but otherwise did not "prevent the employment of properly indentured apprentices upon public works." (Former § 1777.5; Stats. 1937, chs. 90 & 872.)

With the enactment of the Shelley-Maloney Act in 1939, the Legislature redefined the term "apprentice" as a person at least 16 years of age who has entered into a written apprentice agreement, which was required to provide for "not less than two thousand hours of reasonably continuous employment" and "not less than 144 hours per year" of related and supplemental instruction. (Former §§ 3077, 3078; Stats. 1939, ch. 220, § 2; cf. § 3078.5.) The Shelley-Maloney Act also added section 3086. (Former §§ 3086, 3089; Stats. 1939, ch. 220, § 2.)

However, the Shelley-Maloney Act did not amend section 1777.5. It was not until later in 1939 that the Legislature amended that statute to provide that "[t]he term 'apprentice,' as used in this section, means a person at least sixteen years of age who has entered into a written apprentice agreement under [the Shelley-Maloney Act]." (Stats. 1939, ch. 971, § 1.) And it was not until 1957 that the Legislature amended section 1777.5 to explicitly provide that "[o]nly apprentices . . . who are in training under apprenticeship standards and written apprenticeship agreements . . . are eligible to be employed on public works, . . . ." (Former § 1777.5; Stats. 1957, ch. 699, § 1; see also Stats. 1999, ch. 903, § 2.)

Against this background, it becomes clear that in enacting section 3086, the Legislature was concerned only with the effects *the Shelley-Maloney Act* might have on apprenticeship provisions in CBA's. In short, section 3086 prevents the Shelley-Maloney Act from invalidating apprenticeship provisions in CBA's as long as they meet minimum

standards set forth in the act. What section 3086 does *not* do is allow the parties to a CBA to invalidate or displace requirements imposed by other statutory schemes.[9]

At issue here is the requirement that "[o]nly apprentices . . . who are training under apprenticeship standards that have been approved by [the Division] and who are parties to written apprentice agreements . . . are eligible to be employed at the apprentice wage rate on public works." (§ 1777.5, subd. (c).) This is part of the Prevailing Wage Law, not the Shelley-Maloney Act. It follows that even if apprenticeship programs *generally* are free to supplement their training standards with additional work processes—an issue we need not decide—apprentices training under such standards will not be "eligible to be employed at the apprentice wage rate on public works" unless and until the "higher" standards are approved by the Division. (§§ 3075, 3078; 8 CCR, §§ 210, 212, 212.2; see also *Associated Builders, supra*, 4 Cal.4th at pp. 428-429 [noting that state approval is not required for a sponsor to operate an apprenticeship program].) Accordingly, we find no conflict between the challenged regulations and section 3086 and we depart from *Overaa* to the extent it suggests a contrary result.

C. *Overall Statutory Scheme*

Petitioners also contend that the challenged regulations are invalid because they conflict with the overall structure and purposes of the Prevailing Wage Law and the Shelley-Maloney Act. They argue that under the statutory scheme, the determination of

---

[9]    If the Legislature intended otherwise, it presumably would have made that intent explicit, by stating, "*Notwithstanding any other provision of law*, if the apprenticeship standards or the terms of an approved apprentice agreement conflict with the provisions in a collective bargaining agreement, the provisions of the collective bargaining agreement shall prevail," or words to that effect. It did not. (Cf. § 3071, subd. (c) ["Notwithstanding the standards established pursuant to subdivision (a), if the minimum wages, maximum hours, and working conditions for apprentices in the California Firefighter Joint Apprenticeship Program are in conflict with the provisions of a collective bargaining agreement with a public employer, the provisions of the collective bargaining agreement shall prevail"].)

29

prevailing wage rates is delegated specifically to the DIR Director (§ 1770), and that the challenged regulations usurp the Director's authority by defining an "apprenticeable craft or trade" based on the work processes set forth in the apprenticeship program standards. As a result, the regulations undermine the CBA's that serve as the foundation for the Prevailing Wage Law, limiting the tasks apprentices are permitted to perform and forcing union contractors to make a difficult choice whether to violate the regulations or breach their CBA's.

The Council responds that the Legislature carefully distinguishes between classifications that the DIR Director uses when determining prevailing wage rates and classifications that the Council uses when regulating apprentices. The Council contends that it specifically was empowered in section 1777.5, subdivision (d), to define an "apprenticeable craft or trade," and did only that when it adopted the regulations requiring apprentices to work only on work processes specified in the apprentices' training programs.

Again, we conclude the Council has the better argument. The Council is not improperly defining (or redefining) journeyworker occupations under the guise of defining what is "apprenticeable." The new regulations have no effect on how the craft or trade of a journeyworker is determined, or on the work processes in which they may be employed. The regulations simply clarify that for contractors to take advantage of the special apprentice prevailing wage rate, they must assign apprentices work that is included in the approved apprenticeship standards. (8 CCR, §§ 205, subd. (c), 230.1, subd. (c).)

We disagree that the construction we adopt undermines the collective bargaining foundation of the Prevailing Wage Law. Nor do we believe it forces contractors to make a difficult choice whether to violate the regulations or breach their CBA's since, except where otherwise provided, the provisions of the Labor Code prevail over conflicting provisions of CBA's. (See *Industrial Welfare Com. v. Superior Court of Kern County*

30

(1980) 27 Cal.3d 690, 727-728; see also *Dillingham Constr. N.A. v. County of Sonoma* (9th Cir. 1999) 190 F.3d 1034, 1040.)

Further, we find petitioners' interpretation—that programs are free to supplement their standards with additional work processes through collective bargaining—to be at odds with the other provisions of the Shelley-Maloney Act, namely, the provisions governing the approval and amendment of apprenticeship program standards (§ 3075; 8 CCR, § 212.2) and the evaluation of existing program standards (§ 3073.1).[10] We thus conclude the regulations are not inconsistent with the governing statutes.

### III

### *Clarity of the Regulations*

In addition to claiming the regulations violate the authority and consistency standards, petitioners contend the regulations violate the APA's "clarity" standard because they incorporate thousands of pages of program standards that are neither reasonably available to, nor easily understood by, those affected by them.

In opposition, the Council argues that the program standards are not incorporated by reference and that contractors need not refer to them to comply with the regulations. The Council also argues that because the standards are readily obtainable from the Division, any failure to incorporate was at most a technical deviation that should not invalidate the regulations.

---

[10] Although we agree with the Council that an amendment to apprenticeship standards to include new work processes "ought to trigger [a] section 3075 review" to determine whether there would be a "substantial overlap in the work processes" covered by another program, we do not agree that this standard prohibits *any* overlap in work processes. A substantial overlap in work processes means an overlap of a substantial number of work processes covered by the programs, not a substantial overlap in a *single* covered work process. (§ 3075, subds. (c) & (g).) The intent is to protect against redundant apprenticeship programs serving the same craft or trade in the same geographic area, not to prohibit *any* overlap of work processes between programs serving different crafts or trades.

We agree with the Council that the apprenticeship standards were not incorporated and not required to be incorporated by reference because they are not part of the regulation, in the same way that a regulation mandating pesticide use in compliance with labeling would not make the labeling part of the regulation. (See *Patterson Flying Service v. Department of Pesticide Regulation* (2008) 161 Cal.App.4th 411, 429 [concluding registered pesticide labels are not underground regulations]; Gov. Code, § 11342.600; see 1 CCR, § 20, subd. (e).) Nevertheless, we agree with petitioners that the APA's clarity standard demands that the approved program standards be reasonably available to the affected public.

The challenged regulations require contractors to assign work to apprentices based on the program standards approved by the Division and prohibit contractors from assigning apprentices to work processes other than those stated in the apprenticeship standards under which they are training. (8 CCR, § 230.1, subd. (c).) Before commencing work on a contract for public works, every contractor must arrange for the dispatch of apprentices from programs in the geographic area that provide training in the "applicable" craft or trade, which is defined by the work process contained in the standards. (8 CCR, §§ 205, subd. (c), 230.1, subd. (a).) And after work commences, the contractor is responsible for ensuring that the apprentice's on-the-job training is in accordance with the approved program standards and apprenticeship agreement under which the apprentice is training. (8 CCR, § 230.1, subd. (c).) Because contractors cannot fully comply with the regulations without having knowledge of the work processes stated in the program standards, it is axiomatic that the program standards must be reasonably available to them.

Since there is nothing in the challenged regulations specifying how the approved program standards may be obtained or guaranteeing that such documents will be reasonably available to the affected public, we agree that the regulations are inconsistent

with the APA's clarity standard. However, we see this as a technical deviation that does not warrant invalidating the regulations.

As the Council points out, " '[f]ailure to comply with every procedural facet of the APA . . . does not automatically invalidate a regulation. A court may declare the regulation invalid only for . . . "substantial failure" to comply with the act. [Citation.] " ' "Substantial compliance, as the phrase is used in the decisions, means actual compliance in respect to the substance essential to every reasonable objective of the statute.". . . . Where there is compliance as to all matters of substance technical deviations are not to be given the stature of noncompliance. . . . Substance prevails over form.' " ' " (*Western States Petroleum, supra*, 57 Cal.4th at p. 426.)

Here, the challenged regulations are substantially clear and, in most cases, we believe contractors will be able to comply with them either by using their own knowledge of the industry or by specifying the work processes to be performed in their request for the dispatch of apprentices. (8 CCR, § 230.1, subd. (a).) Where it becomes necessary for contractors to review the apprenticeship standards, we are not persuaded contractors will be unable to obtain or understand them. The Division already is required by statute to post a copy of proposed apprenticeship program standards on its website. (§ 3075, subd. (h).) And the Council repeatedly assured commenters that making the current apprenticeship program standards more easily accessible would not be an "insurmountable task" and would not be a "significant impediment" to compliance. We trust the Council will follow through on this assurance. In the meantime, the approved program standards are available from DIR or the Division, if not directly from the program itself. Accordingly, we decline to invalidate the regulations for violating the "clarity" standard.

IV

*Adequacy of the Economic Impact Assessment*

Petitioners contend that the challenged regulations are procedurally deficient because the Council failed to adequately assess the economic impact of the regulations. Again, we decline to invalidate the regulations.

A.     *Additional Legal Background*

The APA requires that an agency assess, as part of its initial statement of reasons, a proposed regulation's "potential for adverse economic impact on California business enterprises and individuals." (Gov. Code, § 11346.3, subd. (a)-(b); see also Gov. Code, § 11346.2, subd. (b)(2).) The economic impact assessment must address several factors, including the extent to which the proposed regulation will affect the creation or elimination of jobs within the state; the creation of new businesses or elimination of existing businesses within the state; the expansion of businesses currently doing business within the state; and the benefits of the regulation to the health and welfare of California residents, worker safety, and the environment. (Gov. Code, § 11346.3, subds. (b)(1)(A)-(D).) The purpose of the analysis is to inform agencies and the public "of the economic consequences of [the] regulatory choices" and provide "tools to determine whether the regulatory proposal is an efficient and effective means of implementing the policy decisions . . . in the least burdensome manner." (Gov. Code, §§ 11346.3, subd. (e), 11346.5, subd. (a)(13); *American Chemistry Council v. Department of Toxic Substances Control* (2022) 86 Cal.App.5th 146, 191 (*American Chemistry Council*).)

"If the agency 'makes an initial determination that the action may have a significant, statewide adverse economic impact directly affecting business,' it must include information regarding the types of businesses affected, a description of compliance requirements resulting from the action, and a statement seeking submission of alternatives 'in the notice of proposed action.' (Gov. Code, § 11346.5, subd. (a)(7).) If the agency 'makes an initial determination that the action will not have a significant,

statewide adverse economic impact directly affecting business, . . . it shall make a declaration to that effect in the notice of proposed action.  In making this declaration, the agency shall provide in the record facts, evidence, documents, testimony, or other evidence upon which the agency relies to support its initial determination.' (Gov. Code, § 11346.5, subd. (a)(8).)  Regardless of which finding is made, the statute requires a 'description of all cost impacts, known to the agency at the time the notice of proposed action is submitted to the office, that a representative private person or business would necessarily incur in reasonable compliance with the proposed action.' " (*American Chemistry Council, supra*, 86 Cal.App.5th at p. 191; Gov. Code, § 11346.5, subd. (a)(9).)

After receiving public comment, the agency must prepare a final statement of reasons for the proposed regulation, updating the information contained in its initial statement.  (Gov. Code, § 11346.9, subd. (a); *John R. Lawson Rock & Oil*, *Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 111; *American Chemistry Council, supra*, 86 Cal.App.5th at p. 194.)  The final statement of reasons must include "[a] determination with supporting information that no alternative considered by the agency . . . would be as effective and less burdensome to affected private persons than the adopted regulation, or . . . more cost effective to affected private persons and equally effective in implementing the statutory policy or other provision of law." (Gov. Code, § 11346.9, subd. (a)(4).)  The final statement of reasons also must include a summary of each objection or recommendation made regarding the proposed action, together with the agency's response.  (Gov. Code, § 11346.9, subd. (a)(3).)

B.     *Additional Factual Background*

Prior to issuing its initial statement of reasons for the proposed regulations, the Council prepared an "Economic and Fiscal Impact Statement" using Department of Finance Form STD 399 (Form 399).  The form stated that no jobs would be created or eliminated by the proposed regulations and that the costs for businesses and individuals to comply with the regulations would be "$0."  The form also included the somewhat

contradictory statement that the total statewide dollar costs that businesses and individuals "may incur" over the life of the regulations would be "$0 to $5-10 million." The form explained that the costs for most businesses were expected to be negligible, but that the regulations could impact "a handful of larger general contractors."

In November 2019, the Council issued its notice of proposed rulemaking and initial statement of reasons for the proposed regulations. The notice recited the Council's "initial determinations" that the regulations (1) would have no "[s]ignificant, statewide adverse economic impact" on businesses, (2) would not impose any costs on local agencies, and (3) were not expected to impose any costs on representative private persons or small businesses. It also stated that a "handful of contractors who may be using registered apprentices to perform specific work" potentially could incur significant costs, although the Council believed the costs would be less than $1 million annually and "may be none at all when offset by increased productivity of better trained workers."

In its initial statement of reasons, the Council explained that the proposed regulations were intended to "close a loophole where the contractor and its journey-level workers were performing work that they were qualified to do in what is considered an 'apprenticeable craft or trade,' but its registered apprentices, . . . were used for work processes that were not part of their approved training program." The Council described this as a "particularized problem that only occurs in a limited number of settings."

For contractors who would be affected by the new regulations, the Council identified four potential options: (1) a contractor using qualified journeyworkers could pay higher, journey-level wages to apprentices engaged in work that is not part of their approved training program, (2) the contractor could request apprentices be dispatched from a different program that provides training in the required work processes, (3) the contractor could enter into a subcontract with a specialty contractor, or (4) the program supplying apprentices to the contractor could seek to amend its training standards to include the work process in question.

The Council determined that "the most likely and least costly option" would be the third, for the contractor to enter into a subcontract with a specialty trades contractor. This was estimated to increase the contractor's costs by about 28 percent, the "average difference between higher paid apprentice wages and lower paid apprentice wages in the Bay Area . . . ." Applying this percentage to a hypothetical "major public works general contractor" in the Bay Area, "with public works revenue of $200 million per year," the Council estimated that the regulations could result in an annual cost increase of up to $212,000.[11] The initial statement noted, however, that "this cost impact may be offset by increased productivity" of the apprentices being trained and supervised in work processes that are part of their approved training programs. The initial statement of reasons concluded that the Council was not aware of any alternatives to the proposed regulations that would be equally effective but less costly for affected parties or more effective without increasing costs.

Following the release of the notice and initial statement of reasons, the Council received public comments critical of the economic impact analysis. Nevertheless, the Council adopted the regulations without change and submitted them to the OAL for approval.

After submission, OAL, the Department of Finance, and others identified concerns about the Council's economic impact assessment, including that: (1) the estimated impact on private businesses of $0 to $5-10 million was contradicted by its statement that the regulations would not impose any costs on businesses; (2) the Council only included an estimated "range" of costs, rather than a single numeric estimate of the most likely or

---

[11] The initial statement of reasons described other assumptions underlying the calculation, including that: (1) approximately 25 percent of the company's gross revenue was for profit and overhead, with the other 75 percent devoted to construction costs; (2) 70 percent of direct construction costs would pay for labor; (3) the contractor would self-perform 30 percent of the labor; and (4) 20 percent of the labor would be for specialty trades apprentices.

37

reasonable costs; and (3) the Council failed to adequately explain the basis for the assumptions underlying its impact assessment.

In response, the Council revised Form 399 to state that the proposed regulations would cause a typical business to face "[a]nnual ongoing costs" of $500,000. In addition, the revised Form 399 stated that the total statewide dollar costs that businesses and individuals may incur over the life of the regulations would be $5 million. The Council also explained that the assumptions underlying the economic impact assessment were based on mathematical calculations performed by Commissioner Hussey, as the owner, Chief Executive Officer, and Chief Financial Officer of Marina Mechanical, "a $20,000,000+ Bay Area signatory mechanical contractor. . . ."

C.    *Analysis*

Petitioners contend the Council's economic analysis violated the APA because the Council (1) failed to conduct a reasoned, fact-based assessment of the regulations' potential adverse economic impacts, (2) failed to adequately assess the impact of the regulations on different segments of the construction industry, and (3) did not provide the public a complete picture of its assessments at the outset of the rulemaking to allow for meaningful public participation.

We conclude that the Council's economic impact assessment, while falling short in some respects, substantially complied with the requirements of the APA. As California courts have explained, the APA sets a relatively low threshold for an initial assessment of economic impact. (*Western States Petroleum, supra*, 57 Cal.4th at pp. 428-429, 431; *Maxwell-Jolly, supra,* 199 Cal.App.4th at pp. 305-308.) While the agency's initial determination must be based on facts, and cannot rely on mere speculative belief, it "need not exhaustively examine the subject or involve extensive data collection." (*Western States Petroleum*, at p. 429; see *Maxwell-Jolly*, at p. 307 [agency not required to assess or declare all adverse economic impact anticipated].) "Moreover, inferences and projections that are ' "the product of logic and reason" ' may provide a valid basis for an initial

38

determination of economic impact. [Citation.] And a regulation will not be invalidated simply because of disagreement over the strict accuracy of cost estimates on which the agency relied to support its initial determination." (*Western States Petroleum,* at p. 429.) We review the agency's initial assessment to determine whether it substantially complied with the requirements of the APA and is supported by substantial evidence. (*Maxwell-Jolly*, at p. 307.)

Here, the Council made an initial determination that the challenged regulations would not have a significant, statewide adverse economic impact directly affecting business. The Council explained that the cost of complying with the proposal would be "limited to a handful of contractors who may be using registered apprentices to perform specific work processes in which the apprentices are not being formally trained . . . ." For most contractors, the Council concluded the cost of compliance would be negligible. For the "handful" of contractors who would be affected, the Council laid out the compliance options and analyzed the cost of what it determined to be the "most likely and least costly option," entering into a contract with a specialty trades contractor. The Council calculated this option would result in a potential cost impact of up to $212,000 per year. And it adequately explained the assumptions built into this calculation.

Petitioners complain that the Council's estimate was based on a single commissioner's experience as a contractor and that it focused on the costs of a hypothetical Bay Area public works contractor. This complaint is not well taken. "The agency is required only to 'make an initial showing that there was some factual basis for [its] decision.' " (*Western States Petroleum, supra*, 57 Cal.4th at p. 429.) We find that the commissioner's opinion, stemming from his decades of experience as a general contractor, is substantial evidence. (See *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 155 [agency may rely on its own experience and training]; *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 900 [opinion of staff is substantial evidence]; see *Eleanor Licensing LLC v. Classic*

*Recreations LLC* (2018) 21 Cal.App.5th 599, 610 [single witness's testimony may be sufficient].)

Petitioners also complain that there is no basis for the Council's assertion that the impact will be limited to a "handful" of large general contractors. But petitioners ignore that, even before the amendments, the Council's regulations required (1) apprenticeship standards to set forth the work processes on which apprentices will be trained, and (2) contractors to assign work so that apprentices obtain the diversified on-the-job training provided for in the apprenticeship standards. (8 CCR, §§ 210, 212, former § 230.1, subd. (c).) Therefore, in the absence of any substantial evidence to the contrary, we find it was reasonable for the Council to infer that the costs would be limited to a small number of contractors.

While we agree the Council should have explained its reasoning and the source of its calculations in the initial statement of reasons, we do not find that its failure to do so warrants invalidating the regulations. (*Maxwell-Jolly, supra*, 199 Cal.App.4th at p. 306; Gov. Code, § 11350; see *Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75 Cal.App.4th 1315, 1329 [upholding economic assessment despite the absence of precise cost figures].) Parties reviewing the initial statement of reasons had sufficient information to understand the Council's cost estimate and participate meaningfully in the rulemaking process. (See *American Chemistry Council, supra*, 86 Cal.App.5th at p. 195.)

Because we conclude the Council's economic impact assessment was reasonable and supported by substantial evidence, we decline to invalidate the regulations.

DISPOSITION

The judgment is affirmed.  Respondent Council shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


_____\s\_____,
Krause, J.


We concur:


\_\_\_\_\_\s\_____,
Duarte, Acting P. J.


\_\_\_\_\_\s\_____,
Mesiwala, J.